**OUTTEN & GOLDEN LLP**
Allison L. Van Kampen
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

MICHELLE RESSLER,

Plaintiff,

v.

THE REAL BROKERAGE INC. and
REAL BROKER LLC,

Defendants.

**COMPLAINT**

**Demand for Trial by Jury**

Plaintiff Michelle Ressler ("Ms. Ressler" or "Plaintiff"), by and through her attorneys, Outten & Golden LLP, brings this action against Defendants The Real Brokerage Inc. (NASDAQ: REAX) and Real Broker LLC (collectively, "the Company," or "Defendants"), and hereby alleges and complains as follows:

## NATURE OF THE ACTION

1.      Ms. Ressler, the former Chief Financial Officer ("CFO") of Defendants, is a 40-year-old Black woman and first-time mother to a nine-month-old baby girl. For the past 18 years, Ms. Ressler has worked tirelessly to establish herself as a senior finance and operations executive in the historically male-dominated financial services and real estate technology industries. Defendants, without basis, cast aspersions on Ms. Ressler's unblemished track record by firing her just three months after she returned from maternity leave, giving her CFO role to her less qualified male subordinate, and issuing a defamatory press release about it.

2.      Ms. Ressler has been the architect behind companies becoming ***companies*** – not just startups with potential, and Defendants were no exception. Under her leadership, in less than five years, the Company grew from a fledgling startup to a major player in the real estate technology sector. When Ms. Ressler joined the Company in July 2020, it had just $16 million in annual revenue; today, the Company is the fastest-growing national real estate brokerage with over $1.3 billion in annual revenue, operating at scale across the US and Canada. Suffice it to say, without Ms. Ressler's strategy, vision, and execution, the Company would not be what it is today.

3.      Rather than reward Ms. Ressler for her unwavering dedication and hard work, Defendants decided to get rid of her because she started a family and dared to challenge the Company's questionable and potentially unlawful conduct. Astonishingly, Defendants' male Chief Executive Officer ("CEO") Tamir Poleg less than subtly suggested that Ms. Ressler could not be both an effective and dedicated CFO and a mother, stating to her during pre-maternity leave discussions about her future at the Company, "***We'll see how you feel after you have the baby, you might find that your priorities change***" and "***Don't underestimate how hard this is going to be once you've had the baby***."

4.      Acting on their admitted bias, from her pregnancy disclosures in January 2024 through her termination on April 23, 2025, Defendants executed a steady campaign to sideline and ultimately oust Ms. Ressler for pretextual reasons so it could give her CFO role to an unencumbered man. Within weeks of her pregnancy announcement, the Company began reassigning her core business units to men and women without babies. While she was on protected leave, Defendants launched noncompliant products without her input and exploited her absence to diminish her role and standing within the Company, and, relatedly, position her less

qualified male subordinate – who she hired and trained, Ravi Jani – to replace her as CFO. Indeed, during her leave, CEO Poleg promised Mr. Jani the CFO role and asked Mr. Jani to "trust him" that the promotion was coming.

5.      On August 15, 2024, Ms. Ressler gave birth to a beautiful baby girl and commenced maternity leave. She went into her leave seriously concerned about the Company's future, including compliance and legal exposure stemming from CEO Poleg's decisions to prematurely launch products that, put simply, did not work. Within weeks of her daughter's birth, Defendants began interfering with Ms. Ressler's protected leave by asking her to attend and present at Board meetings, attend team meetings and employee interviews, take calls, and be responsive on email. Ms. Ressler did what Defendants asked, putting the business ahead of her newborn. She even attended meetings and participated in calls when she was still recovering from childbirth and while nursing and pumping breast milk for her daughter.

6.      When Ms. Ressler returned from maternity leave on January 21, 2025, her job was a fraction of her already diminished role. Defendants failed to restore her business units that they reassigned pre-leave, and, as before, Defendants continued marginalizing her, excluding her from key decisions, systematically undermining her authority, and scapegoating her for leadership failures beyond her control. Defendants also continued to ignore her risk reports about the Company's increasingly problematic actions. By this time, it was even more clear that Defendants planned to fire Ms. Ressler, it was just a matter of when. First, the Company needed to manufacture a reason that it could spin as misconduct and, relatedly, sell to the Board to mask the Company's discriminatory and retaliatory decision to remove its high-performing CFO.

7.      Within around three months of her return from maternity leave, on April 23, 2025, Defendants abruptly terminated Ms. Ressler's employment. During the meeting, CEO Poleg read

aloud from the termination letter: Ms. Ressler was being dismissed "for cause" based on "gross misconduct," specifically that an "internal audit" revealed her "improper use of the Company's bank card" based on eight personal charges incurred between March and July 2024 totaling $17,440.60, specifically $15,946.80 in airfare and $1,493.80 in entertainment expenses that were not even personal but rather related to networking in her capacity as CFO. CEO Poleg then threatened Ms. Ressler, stating that a criminal investigation of her "theft" of Company funds was coming.

8.      Ms. Ressler was blindsided. The Company never interviewed her in connection with any audit or even had a conversation with her about the charges it was using to fire her. When she tried to explain that the entertainment charges were business related and the airfare charges were accidental and offered to repay the Company, CEO Poleg dismissed Ms. Ressler, oddly stating, "Michelle, the party's over."

9.      This of course was not the actual reason Defendants terminated Ms. Ressler's employment, and regardless, it is absurd. That Ms. Ressler, a CFO, would intentionally misuse company funds for personal expenses worth around $17,400, less than 1% of her annual, seven-figure compensation, defies common sense. Additionally, the airfare charges were clearly an oversight. Despite being a large, publicly traded company, Defendants expected CFO Ms. Ressler, who regularly flew all over the world as part of her job, to book her own travel and accommodations and refused her repeated requests for an administrative assistant.

10.     Further exposing Defendants' reason as pretextual, and, separately, discriminatory, Defendants failed to discipline, let alone fire, male executives who engaged in similar or worse behavior. CEO Poleg, for instance, charged to his Company card substantial amounts for a family vacation, yet faced no discipline. Other male leaders routinely failed to

document their expenses to show that they were business related versus personal, without consequence. Only Ms. Ressler was singled out, investigated, abruptly terminated, and defamed in a press release.

11.    Plaintiff brings this action to remedy discrimination and retaliation, in violation of: the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq.*; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*; the New York State Paid Family Leave Law ("NYPFL"), 12 NYCRR §§ 380 *et seq.*; and the New York Labor Law ("NYLL"), § 740. She further brings a claim against Defendants for defamation under New York common law.

12.    As a result of the Company's discrimination, retaliation, defamation, and other violations of law, Ms. Ressler has suffered significant harm, including, but not limited to, loss of employment, reputational damage, emotional distress, humiliation, and millions of dollars in lost wages and benefits.

## THE PARTIES

**Plaintiff**

13.    Plaintiff Michelle Ressler is a Black adult woman and former employee of The Real Brokerage Inc. and subsidiary Real Broker LLC within the meaning of all applicable statutes.

14.    Defendants are a remote company, such that its employees work from all over the country and also from abroad.

15.    During a majority of her employment with Defendants, Ms. Ressler worked and lived in New York City.

16.     Ms. Ressler was the Vice President ("VP") of Finance and later the CFO of all of Defendants' entities, including The Real Brokerage Inc. and Real Broker LLC.

17.     Ms. Ressler moved to Norway on or about April 1, 2025 to be closer to her baby's paternal grandparents who assist with childcare. She currently resides in Norway.

**Defendants**

18.     Defendant The Real Brokerage Inc., a publicly traded company, is a cloud-based real estate brokerage that operates entirely online and provides real estate agents with technology and support.

19.     The Real Brokerage Inc. was incorporated in British Columbia in 2018, is licensed to do business in New York, and currently has headquarters in Miami, Florida and Toronto, Canada.

20.     The Real Brokerage Inc. is the parent company of various entities, including subsidiary Defendant Real Broker LLC, the entity which employs Defendants' workforce in the United States. Real Broker LLC is a corporation duly formed and existing under the laws of the State of Texas, with a principal place of business located at 600 Mamaroneck Avenue #400, Harrison, New York 10528.

21.     During all relevant times, Defendants were Plaintiff's employer within the meaning of all applicable statutes.

22.     During all relevant times, Defendants had more than fifty (50) employees.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action alleges violations of a federal statute.

24.     This Court has supplemental jurisdiction over this action, pursuant to 28 U.S.C. § 1367(a), because, as stated above, this Court properly has federal question jurisdiction and Ms. Ressler's other claims are so closely related to her claims within this Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

25.     Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)-(3), (d) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred within the Southern District of New York, and Defendants are subject to the Court's personal jurisdiction with respect to this action, as Defendants employed Plaintiff in New York, New York.  Further, Ms. Ressler's July 2020 Offer Letter incorporates a choice of law provision providing that she and Real Broker LLC "irrevocably consent to the venue and exclusive personal jurisdiction of the U.S. District Court for the District of New York sitting in NYC."

26.     On June 10, 2025, Ms. Ressler filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex, including pregnancy, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*. and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). The Charge was cross-filed with the New York City Commission on Human Rights. When Plaintiff receives her Notice of Right to Sue from the EEOC, she will seek to amend the Complaint to add her Title VII and PDA claims. The facts set forth herein support those claims as well, and therefore there will be no prejudice to Defendants by this procedure.

## FACTUAL ALLEGATIONS

### Ms. Ressler's Background and Employment with Defendants

27.     Ms. Ressler, a 40-year-old Black woman and mother, is a highly successful, well-known, and respected senior finance and operations leader in the financial services and real estate technology space.

28.     Over the past 18 years, she has earned a reputation as a capable and multifaceted executive who can successfully build and scale companies from early-stage ventures to operational maturity. Ms. Ressler did just that during her over four years at Canaccord Genuity Inc., and again during her nearly five years with Defendants.

29.     Defendants are a cloud-based digital brokerage platform that provides technology and support for real estate agents, including real estate, mortgage, and closing services.

30.     When Defendants hired Ms. Ressler, the Company was a floundering startup that lacked core operational and finance infrastructure. When she joined as VP of Finance in July 2020, the Company was a nine-person startup with less than $1 million on its balance sheet, was struggling to process 25 weekly commission payments, and had roughly 1,100 agents (*i.e.*, clients). Today, Defendants process roughly 1,000 commission payments ***per day*** and boast over 28,000 agents.

31.     Within her first few months, Ms. Ressler introduced financial discipline, scalable infrastructure, and rebuilt critical operational processes from the ground up. She architected the core of Defendants' "trading floor" strategy, now known as the reZEN platform, which brought order, transparency, and speed to the transaction process. In recognition of her early and extraordinary impact, Defendants promoted Ms. Ressler to CFO on October 15, 2020, after just three months at the Company.

32.     In the years that followed, Ms. Ressler built and scaled seven of Defendants' ten critical business functions, specifically Finance & Accounting ("F&A"), Financial Planning & Analysis ("FP&A") and Investor Relations, Internal Audit, Transactions, Human Resources ("HR"), Legal (until the Company hired a General Counsel), and India Operations; advised on strategy; and otherwise led far beyond the scope of a typical CFO. She played an instrumental role in Defendants' rapid growth by, *inter alia*, overseeing multiple strategic acquisitions and a major geographic expansion across the US and Canada and helping drive annual revenues from $16 million when she joined to over $1.3 billion in four years.

**<u>Following Ms. Ressler's Pregnancy Disclosures, Defendants Engaged in Immediate Discrimination and Retaliation, Which Persisted Upon Her Return from Leave</u>**

**A.  Discriminatory Comments**

33.     Ms. Ressler first learned that she was pregnant with her first child in December 2023. After confirmation that the pregnancy was viable, in January 2024, Ms. Ressler told leadership about her pregnancy and intended FMLA/maternity leave in August 2024, specifically CEO Mr. Poleg, and later, President Sharran Srivatsaa, Chief Operating Officer ("COO") Jenna Rozenblat, Chief Technology Officer ("CTO") Pritesh Damani, Chief Marketing Officer ("CMO") Andrea Madden, and Chief Legal Officer ("CLO") Alexandra Lumpkin.

34.     Following her pregnancy disclosures (and also upon her return from maternity leave), male leadership made numerous comments evidencing discriminatory animus, including those rooted in unlawful gender stereotypes.

35.     In February 2024, when discussing her role and future at the Company, CEO Poleg stated to Ms. Ressler, "We'll see how you feel ***after you have the baby***, you might find that your priorities change."

36.     In March or April 2024, during a discussion about Ms. Ressler's business units, equity, and role within the Company, CEO Poleg stated, "We'll see how things are later in the year *after you have the baby*."

37.     In July 2024, one month before she was scheduled to commence maternity leave, CEO Poleg cautioned Ms. Ressler, "***Don't underestimate how hard this is going to be once you've had the baby***."

38.     Following her return from maternity leave on January 21, 2025, in March 2025, Board member Guy Gamzu less than subtly encouraged Ms. Ressler to resign and pursue other opportunities, tying his "advice" to her motherhood, stating: "Maybe your sweet spot is not in a company that is larger, but in a small startup that you can grow and bring to scale. Life is going to change, and it will always get more beautiful, ***now you have [your daughter] and you should focus on that***."

**B. The Company's Discrimination and Retaliation Extended Well Beyond Direct Comments**

39.     After Ms. Ressler disclosed her pregnancy and intended leave, the Company swiftly commenced a discriminatory campaign to push Ms. Ressler out as CFO, and, relatedly, manufacture a reason to terminate her employment for Cause. In the lead-up to and during Ms. Ressler's maternity leave from August 15, 2024 through January 21, 2025, and upon her return from leave, Defendants progressively reassigned her duties, business units and reports, marginalized and undermined her, excluded her, and demeaned her to her team and leadership.

**(1) Business Unit Reassignment(s)**

40.     Right before her pregnancy disclosures, as of January 2024, Ms. Ressler oversaw the following business units: (1) Finance & Accounting; (2) Investor Relations and FP&A; (3) US Transactions; (4) Canada Payments and Settlements; (5) HR; (6) Internal Audit; and (7) Real

India.

41.     Shortly after her pregnancy announcement, Defendants began reassigning Ms. Ressler's business units and other oversight responsibilities. These discriminatory and retaliatory reassignments occurred in a methodical sequence – Canada Settlements in February 2024, US Transactions in August 2024, HR in December 2024, and Internal Audit in January 2025 – corresponding closely with her pregnancy disclosure in January 2024, maternity leave commencing on August 15, 2024, and anticipated return from leave on January 21, 2025. The temporal proximity of Defendants' actions demonstrate that the early erosion of Ms. Ressler's role was always intended to be permanent. This is especially true, since the Company failed to restore any of Ms. Ressler's business units when she returned from maternity leave.

42.     In February 2024, just one month after she told CEO Poleg about her pregnancy, he announced that the Company was removing Canada Settlements from Ms. Ressler's purview (*i.e.*, Finance) and assigning it to COO Ms. Rozenblat, who was not a new mom. Defendants effectuated this adverse action in March or April 2024.

43.     The same day Ms. Ressler commenced FMLA/maternity leave (August 15, 2024), Defendants moved US Transactions out of Finance and into Operations under COO Ms. Rozenblat.[1]

44.     Later, right before her scheduled return from maternity leave, Defendants assigned HR to Dipti Salopek (a new hire, who was not a new mom) in December 2024, and Internal Audit to CLO Ms. Lumpkin, who does not have children, in January 2025.

45.     On information and belief, in late November or early December 2024, CEO Poleg

---

[1] This reassignment became effective January 1, 2025, just three weeks before Ms. Ressler returned from leave.

promised Mr. Jani the CFO role and asked Mr. Jani to "trust him" that the promotion was

coming. Also at year-end 2024, Defendants awarded Mr. Jani substantial equity in the Company.

### (2) Defendants Groomed Ms. Ressler's Male Replacement, Excluded and Marginalized Her, and Ignored Her Reports of Legal and Compliance Risks

46.     During coverage discussions before she commenced FMLA/maternity leave, Ms.

Ressler and CEO Poleg agreed that he would step in as manager to Ms. Ressler's team and

oversee her (remaining) business units in her absence, with the understanding that she would

reassume oversight of her business units when she returned from leave.

47.     Contrary to the agreed coverage plan, Defendants began grooming Ms. Ressler's

male subordinate, then VP of Investor Relations and FP&A Mr. Jani, to take over as CFO, by

assigning him many of Ms. Ressler's CFO functions in the lead up to and during her maternity

leave commencing on August 15, 2024.

48.     For example, per CEO Poleg, even before she commenced leave, beginning in

May 2024, Mr. Jani began attending all board meetings *and* directing Ms. Ressler's core

business units, including, but not limited to, Finance & Accounting.

49.     Despite her concerns about the Company's preferential treatment towards Mr.

Jani and what it could mean for her job security, Ms. Ressler worked tirelessly during the months

leading up to her maternity leave to position Defendants for success in her absence, including by

imploring leadership to address mounting operational and compliance problems that threatened

the business.

50.     In June 2024, Ms. Ressler reported the following issues to CEO Poleg: *inter alia*,

a lack of compliance and financial infrastructure for newly launched financial products;

premature product launches without accounting, finance, or back-office readiness; and material

risk exposures from product initiatives, including risk of duplicate payments, accounting

inaccuracies, and tax compliance and regulatory exposure. CEO Poleg in response refused to acknowledge any of these issues as serious and declined to work with Ms. Ressler on ways to fix them.

51.     Ms. Ressler did not give up. In July 2024, the month before she commenced FMLA leave, with support from her Chief of Staff, Ms. Ressler presented to CEO Poleg and CTO Mr. Damani a comprehensive report outlining multiple product-related issues that compromised financial integrity, raised compliance and regulatory concerns, and posed significant risk to the Company.

52.     As before, male leadership refused to acknowledge the risks and instead doubled down, responding with antagonism and painting Ms. Ressler as the problem for getting in the way. They also refused Ms. Ressler's requests for the resources needed to address and remedy the issues. Shortly after that combative meeting, Ms. Ressler's Chief of Staff resigned without another job.

53.     Also in July 2024, Ms. Ressler specifically asked to participate in a strategy discussion with the CEO and CTO to identify how to stand up the necessary compliance and control functions – whether through internal resources or external consultants – without slowing product velocity. They ignored her request for a meeting.

54.     Ms. Ressler began her FMLA/maternity leave soon after, on August 15, 2024, rightly concerned about what would happen if leadership continued to ignore the core operational, regulatory, and legal risks she had reported. Ultimately, at least some of the issues Ms. Ressler raised in July 2024 were addressed during her leave, albeit only because of pressure from the Board, validating Ms. Ressler's concerns and underscoring the discriminatory and retaliatory nature of male leadership's aggressive and dismissive response to them.

**Defendants Interfered with Ms. Ressler's Protected Leave,
While Also Exploiting Her Leave to Position Her for Dismissal**

55.     Defendants required Ms. Ressler to work during her leave, when it suited them at least. Defendants asked Ms. Ressler to attend and present at Board meetings (because Mr. Jani was not qualified to do so), attend team meetings, and participate in employee interviews, albeit not for C-Suite positions, *see* ¶¶ 69-71, *infra*. Defendants also expected Ms. Ressler to take calls and be responsive on email during her protected leave.

56.     Despite requiring her to work and otherwise be "plugged in" during her leave, Defendants selectively and strategically excluded Ms. Ressler from meetings and communications (including despite her express requests to participate) when her involvement risked derailing Defendants' plan to fire Ms. Ressler when she returned from leave and elevate Mr. Jani into her CFO role. Further, even though Defendants knew that Ms. Ressler was just a call or email away, they intentionally kept Ms. Ressler in the dark and made numerous decisions that further diminished the scope of her role, and impacted the Company's finances (Ms. Ressler's core responsibility as CFO), compliance, and the overall future of the Company she helped build.

57.     For example, without letting its CFO know, Defendants sourced, negotiated, and in February or early March 2025 (when Ms. Ressler was back at work) sent a Letter of Intent ("LOI") for an acquisition. While Defendants failed to inform CFO Ms. Ressler of this major business decision, they included her male subordinate Mr. Jani in discussions about the LOI during and after her leave.

58.     Although she and her team had presented a five-year financial target plan to the Board in July 2024, Ms. Ressler had no meaningful role in building the actual 2025 budget. Her participation was limited to two brief conversations in which she suggested cuts and called out

14

formula errors – proposed changes male leadership ignored. In late 2024, CEO Poleg and Mr. Jani presented the 2025 budget, which was prepared without meaningful CFO input. Prior to her maternity leave, Ms. Ressler was integral in building and presenting Real's annual budgets.

### A. The Real Wallet Disaster; Other Mismanagement by Male Leadership

59.     Per Company policy and standard industry practice, the CFO is required to review and approve any product with financial impact. Yet, during Ms. Ressler's maternity leave, and despite asking her to work, Defendants bypassed her and this critical control resulting in material failures and potential violations of law.

60.     Defendants' seminal, regulated product is Real Wallet, a banking and lending product for real estate agents. According to Defendants' website,[2] US Agents should think of Real Wallet as "as your personal financial powerhouse—a debit account that's seamlessly tied to your commission income and revenue share. The game changer? You'll have access to your money **days faster** than traditional banks. No more waiting on the sidelines for your commission to clear."

61.     Contrary to policy and standard practice, and even though Defendants knew Ms. Ressler was working because they required it, in October 2024, the Company announced the launch of Real Wallet without CFO Ms. Ressler's review, approval, or even notice – ***and knowing that the product did not work***. Among other issues, the prematurely launched product did not comply with the underlying legal agreements, had no back-office compliance or financial infrastructure, and was nonfunctional in Canada.

62.     When Ms. Ressler raised concerns about these issues upon her return from

---

[2] *What is Real Wallet?* THEREALBROKERAGE.COM, https://support.therealbrokerage.com/hc/en-us/articles/27222653693847-What-is-Real-Wallet (last accessed June 6, 2025).

maternity leave in or around February 2025, CEO Poleg dismissed her with a telling remark: "I'm worried we are beginning to slow down." In context, his message was unmistakable: Defendants needed to impress investors with flashy, attention-grabbing product launches – even if the products were nonfunctional or noncompliant – to distract from the Company's mounting operational risks and inability to generate sustainable profit margins through its revenue diversification strategy. While at the time Defendants enjoyed top-line growth, the Company's stock had dropped by 25%, its ancillary products (Mortgage and Title) were underperforming, and it had just announced a stop work on its consumer platform. Defendants needed momentum, and Ms. Ressler's insistence on controls and compliance was inconvenient – even though it was entirely correct.

63.    Real Wallet's fundamental failures continued post-launch, including duplicate commission and loan disbursements, the inability to recollect funds, and blackout periods caused by improper system updates that prevented commission payments from processing. If left unaddressed, these issues exposed Defendants to operational and regulatory risk.

64.    Days before her unlawful dismissal, on April 21, 2025, Ms. Ressler again flagged serious concerns about Real Wallet's malfunctions. Real estate agents were not repaying the advanced funds they received (a 21% delinquency rate) and as a result the Company was risking substantial losses by extending the program, *i.e.*, increasing the amount of money advanced to agents, without sufficient funds to do so. To address this issue, Ms. Ressler told Defendants they needed to fix the product before expanding the program and take an expected credit loss (ECL) reserve. Defendants refused because, put simply, it would look bad to investors.

65.    In a financial statement review meeting the same day (April 21), when Ms. Ressler reiterated Defendants' need for the reserve, Defendants' Controller responded, "Ravi

[Jani] does not want to take one." Clearly, by that time, Mr. Jani was already making unilateral CFO-level decisions.

66.    Despite knowing that Real Wallet remained nonfunctional and unprofitable, evidenced by the rising delinquency rate, CEO Poleg nevertheless pushed to scale the program by soliciting funds from agents and issuing loans against them, exposing the Company to financial risk nearing 70% of its balance sheet.

67.    Defendants followed the same reckless approach with the Company's Mortgage Early Commission Payments product ("Mortgage") – another flawed regulated product with fundamental problems that CEO Poleg prematurely launched anyway. The purpose of this product is disbursing funds ahead of close across a platform projected to process over 150,000 transactions in 2025.

68.    Pre-launch, in or around April 2025, Ms. Ressler raised with leadership what needed to be done to "fix" that product and bring it into compliance, including proper accounting treatment, and expressly questioned whether Defendants conduct vis-à-vis Mortgage violated the law, including the Real Estate Settlement Procedures Act (RESPA). CEO Poleg dismissed her, tried to downplay her concerns as pedantic, stating, "***We can't hold the launch for accounting entries***," and proceeded with the Mortgage launch anyway.

**B. Exclusion from Hiring Decisions**

69.    Even though Defendants required Ms. Ressler to work and knew she was "plugged in" during her leave, CEO Poleg intentionally excluded her from hiring discussions for two C-suite roles – Chief Human Resources Officer ("CHRO") and Chief Information Officer ("CIO").

70.    Regarding the CHRO, prior to her protected leave, Ms. Ressler oversaw the HR

function. As to both hirings, prior to her leave, CFO Ms. Ressler was involved in all leadership

hiring decisions. And yet, CEO Poleg unilaterally hired a CHRO without consulting Ms. Ressler

(other than to communicate his already made decision) – breaking with past practice and further

diminishing Ms. Ressler's role and standing within the Company.

71.    The CHRO was then directed to report to the CEO, not Ms. Ressler – a superficial

change to knock Ms. Ressler down yet another rung. Specifically, upon her return from

maternity leave in January 2025 and continuing for three months (*i.e.*, right up until her unlawful

dismissal on April 23, 2025), Ms. Ressler (not the CEO) functioned as the CHRO's primary

leader and point of contact, guided her onboarding and provided strategic direction.

### Defendants' Escalating Mistreatment Upon Ms. Ressler's Return from Maternity Leave and in Response to Her Risk Reports

72.    When Ms. Ressler returned from maternity leave on January 21, 2025, her job

was a fraction of her already diminished role. Notably, while framed as temporary before she

went out on leave, none of Ms. Ressler's business units were restored to her oversight. She also

came back to a mess in terms of Defendants' finance operations. Additionally, there was a

distinct shift in Defendants' attitude towards Ms. Ressler which sent a clear message – she was

no longer welcome, had fallen out of favor with leadership, and was otherwise a pariah.

73.    Immediately upon her return from leave, Ms. Ressler's male subordinate Mr. Jani,

who Defendants had already tapped to replace her as CFO, conducted himself like he was

already promoted, often engaging in blatant insubordination and marginalization. This included

attending high-level meetings in Ms. Ressler's place and meeting directly with her superiors and

subordinates, in each instance without inviting or even informing his boss Ms. Ressler.

74.    Mr. Jani flagrantly backdoored Ms. Ressler up and down the chain, including

presenting to leadership on topics that were unquestionably Ms. Ressler's responsibility as CFO.

For example, in February 2025, Mr. Jani presented to the CEO and President[3] FP&A findings –
that Ms. Ressler had specifically directed him to prepare for her to present – without consulting
or even notifying her. Defendants also asked Mr. Jani to perform various analysis tasks related to
expense management and profitability, including a vendor analysis – again, work plainly within
Ms. Ressler's purview as CFO.

75.    Also one month following her return from maternity leave, Defendants excluded
Ms. Ressler from management discussions for one of her direct reports. Specifically, during a
late February 2025 business trip in Dubai, without inviting or even notifying Ms. Ressler, nearly
the entire C-suite (CEO, CTO, CHRO, and CLO) met with her direct report, General Manager
India, Vivek Patel, to discuss his role and responsibilities. On information and belief, Defendants
asked for this meeting to gauge whether Mr. Patel would be a retention risk when Ms. Ressler
was no longer CFO and to get his opinion on where the India Operations business unit should
live after her departure. Prior to her maternity leave, Ms. Ressler led and was otherwise actively
involved in the management of employees working in the business units she oversaw.

76.    During a March 4, 2025 all-hands meeting, President Srivatsaa, when introducing
Finance leadership, stated "this is Michelle, our CFO, the leader of finance operations **_alongside
Ravi_**." This was the first time Ms. Ressler was introduced as a dual leader of Finance.

77.    At the same time, Ms. Ressler began making proposals to leadership to address
material structural challenges that put Defendants' operational efficiency and financial integrity
at risk, including the CEO's recurring (and unchecked) disregard for financial controls and
compliance when launching products. For example, on or about March 4, 2025, Ms. Ressler
submitted a governance-level proposal to CEO Poleg, who in turn shared it with two (male)

---

[3] The President stepped down on March 1, with a June 1, 2025 last day.

Board members, recommending that Defendants adopt a co-CEO or Operational CEO model to address escalating dysfunction in execution, mitigate compliance and regulatory risk, and increase leadership accountability. CEO Poleg outright refused to discuss her proposal.

78.     Also in March 2025, *i.e*., about three months post-maternity leave, the Company less than subtly encouraged Ms. Ressler to resign and pursue other opportunities, tying this "advice" to her motherhood. Specifically, Board member Guy Gamzu stated: "Maybe your sweet spot is not in a company that is larger, but in a small startup that you can grow and bring to scale. Life is going to change, and it will always get more beautiful, ***now you have [your daughter] and you should focus on that***."

79.     Mr. Gamzu made this comment encouraging Ms. Ressler to resign in response to Ms. Ressler's reports about Defendants' deficient operating structure, inefficiencies, leadership issues, declining margins, Defendants' breach of lending agreements (mainly terms governing the product development for Real Wallet), and her recommendation for changes to restore oversight and stabilize leadership.

80.     To further position Ms. Ressler's less qualified male subordinate without comparable caregiving responsibilities to succeed her as CFO, on March 31, 2025, CEO Poleg unilaterally "transitioned" (code: promoted) Mr. Jani from VP of IR and FP&A to "VP of Enterprise Strategy" – a new position created just for him. While, based on the job description, Mr. Jani's duties were the same, he now reported directly to the CEO, not CFO Ms. Ressler.

81.     Growing increasingly concerned about Defendants' future, Ms. Ressler authored and on April 10, 2025 submitted to the C-suite a comprehensive strategic risk memo, titled "Scaling Through Structure." This document outlined a proposed organizational realignment to mitigate the growing risk related to undisciplined product launches, cross-functional

breakdowns, and gaps in financial oversight. This was a forward-looking risk alert from

Defendants' CFO, identifying structural dysfunction that hindered execution and obscured

visibility into high-risk product launches, including Defendants' regulated product offerings like

Mortgage and Wallet. Her proposal made clear that, absent swift remedial action, Defendants'

internal failures threatened to impact financial reporting integrity and investor trust.

82.    Ms. Ressler's sounding the alarm analysis should have, and if she were a man

would have, at a minimum, elicited immediate executive and Board engagement. Instead, the

Board and C-Suite ignored her risk alert and fired her not even three weeks later.

## Defendants Used an Internal Audit to Set the Stage for Ms. Ressler's Discriminatory and Retaliatory Dismissal

83.    Shortly after Ms. Ressler's return from leave, in early March 2025, Defendants

commenced a purportedly urgent internal travel and entertainment ("T&E") audit, nominally as

part of a broader internal controls review intended to test systems and processes and relatedly

assess operational effectiveness and efficiency in a controlled environment.

84.    In reality, Defendants used this audit to conduct a pretextual deep dive into Ms.

Ressler's expenses, under the guise of routine review, to manufacture grounds for termination

and clear the way for her less qualified and unencumbered male successor.

85.    The rushed T&E audit revealed institutional problems, including Defendants'

need for a corporate credit card use policy and other longstanding issues related to reviewing and

processing business expenses, such as: the lack of supporting documentation/receipts for

expenses by numerous employees and members of the C-suite; the President approving his own

expenses, thereby bypassing any approval or review process; and the historical use of only one or

two American Express ("AmEx") cards, which were shared across departments, making it

difficult to attribute charges to a specific person or department and assess the business

justification for those charges.

86.    Any issues surrounding charges on Ms. Ressler's corporate AmEx date back to Defendants' earliest stage of operations, when the Company maintained a single "master account" corporate AmEx card to support centralized startup functions. As the Company scaled and grew, the "master account" card, originally held by Ms. Ressler as CFO, remained embedded in multiple departmental workflows and was used by personnel across teams spanning the entire company, including, but not limited to, Operations, Research & Development, and Marketing.

87.    Even though Defendants had clearly outgrown this stopgap expense processing system, it refused to do anything about it.

88.    Beginning in 2022 and continuing, to ensure improved expense tracking and compliance, Ms. Ressler repeatedly asked for approval to close the master AmEx account and for her to be issued a new card (with its own account number) for her exclusive use. Defendants refused, citing administrative inconvenience and potential disruption.

89.    Beginning in 2023, and most recently in December 2024 (the month before she commenced maternity leave), Ms. Ressler and the Finance team implored leadership to allocate budget and headcount so that it could (finally) transition to a centralized procurement and expense system, as required for a company of its size. Defendants refused, because they did not want to pay for it.

90.    As a result, the Company with full knowledge continued operating with a flawed and non-compliant expense process, which, among other issues, made attributing transactions charged to the master account in Ms. Ressler's name to her versus the countless others who used it, difficult, if not impossible. And with this knowledge, Defendants proceeded with the T&E audit, which it used to isolate Ms. Ressler's charges to dissect, while failing to investigate or

discipline any of the other (predominantly male) executives who incurred undocumented or improperly coded charges to the corporate AmEx.

91.     The T&E audit included approximately 140 samples, all flagged with comments in an Excel spreadsheet, from which VP of Internal Audit Sung Mayerhofer selected more of Ms. Ressler's transactions for scrutiny than those of any other executive, and in fact, more than all other executives combined.

92.     As Defendants intended, the T&E audit finally gave the Company what it had been hoping for ever since Ms. Ressler announced her pregnancy – a superficially serious reason to brand her as distrustful and eligible for immediate termination, and allegedly with Cause.

### Defendants Discriminated Against Ms. Ressler Based on Her Gender and Pregnancy by Terminating Her Employment Without Cause and for Pretextual Reasons

93.     On April 23, 2025, Defendants abruptly terminated Ms. Ressler's employment. In the meeting attended by the CHRO and CEO, Mr. Poleg opened by reading the termination letter, including rattling off a handful of charges to Ms. Ressler's widely used corporate AmEx card, totaling $17,440.60, specifically $15,946.80 in airfare and $1,493.80 in entertainment expenses. CEO Poleg then threatened Ms. Ressler, stating that a criminal investigation of her "theft" of Company funds was coming. Then the CHRO announced that Ms. Ressler's employment was being terminated for Cause, effective immediately.

94.     Ms. Ressler was blindsided. How could the Company she helped build for over four years fire her over so clearly unintentional and immaterial charges – ***and without an interview or even a conversation with her first?***

95.     When notified, Ms. Ressler tried to explain that the entertainment charges were work-related, and even so, immediately offered to repay the Company for the full amount it claimed were personal charges. It was too late, as Defendants had long before decided that they

needed Ms. Ressler gone because of her motherhood and so the Company could award her male subordinate Mr. Jani the promotion to CFO it promised him during Ms. Ressler's maternity leave. Indeed, when during the termination meeting Ms. Ressler questioned the complete lack of due process and offered to repay any monies owed, CEO Poleg dismissed her, strangely stating, "Michelle, the party's over."

96.     Defendants' stated reason is not only pretextual, it evidences gender discrimination, as Defendants failed to discipline male executives who engaged in similar or worse conduct.

97.     CEO Mr. Poleg played fast and loose with the Company's money generally and specifically when it came to charging personal expenses to the business, yet suffered no discipline. As just one example, CEO Poleg (giving him the benefit of the doubt, inadvertently) charged substantial personal expenses to his corporate AmEx during a family vacation in Dubai just weeks before Defendants fired Ms. Ressler, allegedly for Cause, for inadvertently charging much less to her company credit card.

98.     Additionally, by his design, CEO Poleg's use of Company funds for his expenses was a black box and inherently comingled. He routed all of his travel (business and personal) through a third-party agency, paid by the Company's Israeli subsidiary, **bypassing the Company's internal approval processes entirely**. His travel and accommodation charges were not visible to Finance and were simply consolidated into Defendants' "P&L" (Profit and Loss Statement) – further shielding his own spending from oversight. By comparison, Defendants scrutinized each and every expense of CFO Ms. Ressler – evidencing a gender-based double standard.

99.     Further demonstrating Defendants' differential treatment, while Ms. Ressler

consistently acted with the utmost integrity and was never previously faulted or questioned about any performance issue prior to her unlawful dismissal (and the alleged misconduct the Company cited to fire her was not serious), Mr. Poleg's record as CEO is hardly clean. He engaged in, without consequence, various forms of misconduct and conduct that was detrimental to the business – much worse than Ms. Ressler's alleged terminable conduct – *inter alia*, rushing product launches without required infrastructure and systems (or even a functioning product), refusing to consider Ms. Ressler's (and others') informed advice on Defendants' risk and legal/regulatory exposure, and ousting CFO Ms. Ressler without Cause or any semblance of due process for a bogus reason so that Defendants could put an unqualified man in her role, and, relatedly, publishing a defamatory press release about her departure that harmed both Ms. Ressler's and Defendants' reputation, *see* ¶¶ 104-13, *infra.*

### A. The Charges at Issue

100.    The eight charges totaling around $17,400 that the Company used to create the appearance of a nondiscriminatory and nonretaliatory reason were either not personal or, regarding the airfare, unintentional and immaterial. The entertainment charges were for Ms. Ressler, but in the context of outings with business associates as part of her role as CFO. Regarding all of the charges at issue, they were incurred over a four-month period (when Ms. Ressler was pregnant, between March – July 2024), and the majority were stale, with some predating Plaintiff's April 23, 2025 dismissal by over a year. These charges were also immaterial in context. They comprised a small portion of Ms. Ressler's annual business expenses and were a minute fraction of her seven-figure annual compensation.

101.    There is ***nothing*** to suggest that any of the airfare charges the Company used to justify her termination were anything more than an oversight by Ms. Ressler, who at the time was constantly traveling across multiple time zones to support Defendants' expansion. This

oversight was explainable and in fact stemmed from a problem Defendants created, as they refused Ms. Ressler's repeated requests for an administrative assistant, thus requiring CFO Ms. Ressler to book and pay for her own business-related travel, accommodations, and investor-focused events and entertainment.

102.    As CFO, Ms. Ressler incurred substantial and routine business expenses to effectively perform her role – *e.g.*, global travel, client and investor engagement, team building, corporate events, competitive research, and executive and board meetings. Throughout 2024 (the year of the charges at issue), while pregnant and often physically unwell, Ms. Ressler continued representing the Company at conferences, investor roadshows, corporate presentations, and strategic offsites – grinding through an intense travel schedule in service of the Company's growth. To accomplish this worthwhile (and painstaking) effort, Ms. Ressler needed to regularly charge thousands in business expenses to her corporate AmEx, sometimes multiple times per day.

103.    Finally, to reiterate, Ms. Ressler has repeatedly made clear to Defendants that she is willing to repay the Company for any of her inadvertent personal charges. She said this during the April 23, 2025 termination meeting, in an email to CEO Poleg later that day, and after her dismissal through her counsel. On the latter, on May 16, 2025, Ms. Ressler expressly asked the Company how to make the payment (wire, check, etc.) and to confirm the amount Defendants believe she owes. As of this filing, Defendants have not confirmed the amount, nor have they told her how to remit payment.

### Defendants Defamed Ms. Ressler

104.    One day after blindsiding Ms. Ressler with her abrupt dismissal, on April 24, 2025, Defendants published a press release which was clearly intended to defame, intimidate and

discredit her, and otherwise unjustifiably brand her as some sort of criminal.

105.    Defendants' press release, ostensibly about Mr. Jani's promotion to CFO, included wholly unnecessary, defamatory statements about Ms. Ressler, specifically:

> Ms. Ressler's employment with the Company was terminated based on the Company's opinion that she engaged in actions that violated Company policies. While the Company's review of Ms. Ressler's actions is ongoing, the Company does not believe that the actions of the former CFO had any material impact on the Company's previously issued financial statements.

106.    Defendants had no obligation, legal, investor-facing, or otherwise, to issue such a statement.

107.    It could have, but chose not to, issue a benign press release about Mr. Jani's promotion to CFO, without any mention of Ms. Ressler.

108.    The press release's references to "actions that violated Company policies," "ongoing" review, and that Ms. Ressler's conduct did not impact "financial statements," in the context of a CFO's termination, was designed to (and did) imply that she was fired for serious financial misconduct.

109.    The press release contains false statements. Ms. Ressler did not violate "Company policies." By Defendants' admission, there was no corporate credit card use policy. While the termination letter references violations of Defendants' Code of Conduct, it did not specify what provisions she allegedly violated. Regardless, Plaintiff seriously doubts that immaterial and unintentional charges constitute a violation of that policy.

110.    Defendants' defamatory statements have had their intended effect – numerous individuals orally and in writing have reached out to Ms. Ressler inquiring about what she did to get fired from Defendants and in such an awful manner. As just one example, on April 24, 2025, someone, expressly referring to the press release, commented on Ms. Ressler's personal social

media account (emphasis added): "what ***illegal activities*** did you to do to get fired from REAX publicly?? stock dipped."[4]

111.    Titles of articles published by news outlets that covered the press release further demonstrate Defendants' statements' defamatory impact, *e.g.*, "Real Brokerage ***Fires CFO***, names Ravi Jani as successor,"[5] "Real Brokerage ***terminates CFO Michelle Ressler***, Ravi Jani to succeed," etc. (emphasis added).[6]

112.    Defendants' false public statements about Ms. Ressler's dismissal referencing the Company's "opinion" that she violated unspecified policies without any factual recitation regarding the basis of that "opinion" and reference to an "ongoing" review, imply that Defendants' "opinion" is based on facts undisclosed to the reader, thereby constituting actionable defamation based on mixed opinion.

113.    Amplifying the harm, the same day (April 24), President Mr. Srivatsaa published a glowing LinkedIn tribute framing Defendants' new CFO Mr. Jani as the transformative force behind Defendants' success – plainly attempting to erase Ms. Ressler and her indisputable and integral role in all aspects of Defendants' success during her four-plus years as CFO. The President's statements, when viewed in tandem with the defamatory press release, have severely and irreparably harmed Ms. Ressler's reputation and constitute defamation.

---

[4] The Company's stock only fell 1.29% following the announcement, a drop that was likely related to seasonal trends and/or market factors, not Ms. Ressler's alleged misconduct which, absent Defendants' gratuitous and defamatory press release, would not have been known to the public. Put simply, Defendants, and not Ms. Ressler, is responsible for any financial impact on the Company or its stock in the aftermath of Ms. Ressler's publicly announced abrupt dismissal for alleged policy violations.

[5] Delozier, Jonathan, *Real Brokerage fires CFO, names Ravi Jani as successor*, HOUSINGWIRE.COM (April 24, 2025 at 5:12pm), https://www.housingwire.com/articles/real-brokerage-new-cfo-ravi-jani-michelle-ressler-fired/

[6] *Real Brokerage terminates CFO Michelle Ressler, Ravi Jani to succeed*, Tipranks.com (April 24, 2025 at 4:43am), https://www.tipranks.com/news/the-fly/real-brokerage-terminates-cfo-michelle-ressler-ravi-jani-to-succeed.

## Ongoing Retaliation – Targeted External Audit

114.    On April 25, 2025, Ms. Ressler through her counsel put Defendants on notice of her discrimination and retaliation claims via email. She sent a formal letter outlining in detail the allegations that support her claims on May 6, 2025.

115.    At some point, Defendants engaged an "external" auditor to conduct a review of Ms. Ressler's (and, on information and belief, no other executive's) business expenses.

116.    Upon learning about the "external audit" for the first time on May 15, 2025, Ms. Ressler made clear her willingness to cooperate in that process, including by attending an interview with the external auditors.

117.    She also reiterated in writing on May 16, 2025 her willingness to repay any errant charges identified in the audit.

118.    As of this filing, no one has contacted Ms. Ressler about an interview.

119.    As of this filing, Defendants have not identified who is conducting the audit, when it expects the audit to complete, or anything concerning the findings of said audit.

120.    As of this filing, Defendants have continued to threaten legal action against Ms. Ressler based on mistaken charges that she has unequivocally offered to repay.

## CONCLUSION

121.    As a result of the termination of her employment and the manner in which Defendants handled it, Ms. Ressler has suffered significant economic harm, including, but not limited to, the loss of her employment and millions of dollars in lost wages and benefits, including canceled Restricted Stock Units.

122.    Ms. Ressler has also suffered severe emotional distress, including, but not limited to, significant anxiety, depression, and social isolation. Her professional reputation has been

seriously and irreparably harmed as a result of Defendants' handling of the termination of her employment, including, but not limited to, the defamatory press release.

## FIRST CAUSE OF ACTION
### Interference in Violation of the
### Family and Medical Leave Act (29 U.S.C. §§ 2611 *et seq.*)

123.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

124.    Ms. Ressler, who had been employed fulltime by Defendants for almost five years, was an employee of Defendants under federal law.

125.    Defendants are "employers" under federal law.

126.    Ms. Ressler was eligible to take leave under the FMLA having worked one thousand two hundred and fifty or more hours within the twelve-month period immediately preceding her request for FMLA leave. Ms. Ressler gave notice to Defendants of her intention to take leave when she announced her pregnancy.

127.    By the acts and practices described, Defendants interfered with, restrained, and/or denied Plaintiff her rights by requiring her to work during her protected leave, in violation of the FMLA, 29 U.S.C. §§ 2612, 2614, and 2615.

128.    Defendants knew that their actions violated the FMLA and/or Defendants' actions were not in good faith.

129.    As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

**SECOND CAUSE OF ACTION**
**Retaliation in Violation of the**
**Family and Medical Leave Act (29 U.S.C. §§ 2611 *et seq.*)**

130.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

131.    Ms. Ressler, a qualified "employee," took FMLA leave to give birth to and care for her infant daughter.

132.    Defendants are "employers" under federal law.

133.    By the acts and practices described, Defendants willfully violated the FMLA by retaliating against Ms. Ressler for exercising her rights to FMLA leave by stripping her of her duties, reassigning her duties and business units, and ultimately terminating her employment upon her return from leave.

134.    Defendants knew that their actions violated the FMLA and/or Defendants' actions were not in good faith.

135.    As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

**THIRD CAUSE OF ACTION**
**Gender and Pregnancy Discrimination in Violation of the**
**New York City Human Rights Law (N.Y.C. Admin. Code §§ 8-101 *et seq.*)**

136.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

137.    Ms. Ressler was an "employee" for the purposes of the NYCHRL.

138.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for the purposes of the NYCHRL.

139.    Under the NYCHRL, it is unlawful to treat any employee "less well" in the terms and conditions of her employment because of her gender or pregnancy.

140.    Defendants discriminated against Ms. Ressler by *inter alia*, reassigning her duties and business units and reports to men and/or non-pregnant women or women who had not taken a recent maternity leave or who did not have babies; marginalizing and undermining her; excluding her; demeaning her to her team and leadership; during her maternity leave grooming, and later promoting, her less qualified male subordinate into her CFO role; and, following her return from maternity leave, terminating her employment, but not that of her similarly-situated male peers.

141.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

142.    As a result of Defendants' discriminatory treatment and termination of her employment, Ms. Ressler has suffered significant harm, including, but not limited to, millions of dollars in lost past and future compensation and benefits, damages to compensate her for reputational harm and past and future physical and emotional distress, punitive damages, the reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

**FOURTH CAUSE OF ACTION**
**Gender and Pregnancy Discrimination in Violation of the**
**New York State Human Rights Law (N.Y. Exec. Law §§ 296 *et seq*.)**

143.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

144.    Ms. Ressler was an "employee" for the purposes of the NYSHRL.

145.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for the purposes of the NYSHRL.

146.    Under the NYSHRL, it is unlawful to discriminate against any employee on the basis of their gender and/or pregnancy by subjecting them to inferior terms, conditions, or privileges of employment.

147.    Defendants discriminated against Ms. Ressler by *inter alia*, reassigning her duties and business units and reports to men and/or non-pregnant women or women who had not taken a recent maternity leave or who did not have babies; marginalizing and undermining her; excluding her; demeaning her to her team and leadership; during her maternity leave grooming, and later promoting, her less qualified male subordinate into her CFO role; and, following her return from maternity leave, terminating her employment, but not that of her similarly-situated male peers.

148.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

149.    As a result of Defendants' discriminatory treatment and termination of her employment, Ms. Ressler has suffered significant harm, including, but not limited to, millions of dollars in lost past and future compensation and benefits, damages to compensate her for reputational harm and past and future physical and emotional distress, punitive damages, the reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

**FIFTH CAUSE OF ACTION**
**Retaliation in Violation of the**
**the New York State Paid Family Leave Law (12 NYCRR § 380)**

150.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

151.    Ms. Ressler was an "employee" under New York State law.

152.    The Real Brokerage Inc. and Real Broker LLC were "covered employer(s)" under

33

New York State law.

153.    Ms. Ressler was eligible for family leave during her employment with Defendants having worked for as least 26 consecutive work weeks preceding the first full day her family leave began.

154.    By the acts and practices described herein, Defendants retaliated against Ms. Ressler for exercising her rights to a parental leave in violation of the NYPFL by not allowing her to return to the same position following her leave and ultimately terminating her employment.

155.    Defendants knew that their actions violated the NYPFL and/or Defendants' actions were not in good faith.

156.    As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

### SIXTH CAUSE OF ACTION
**Retaliation in Violation of
New York Labor Law § 740**

157.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

158.    Ms. Ressler was an "employee" for the purposes of the NYLL.

159.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for the purposes of the NYLL.

160.    Ms. Ressler engaged in protected activities under the NYLL Section 740, *inter alia*, when she raised complaints to Defendants' senior management regarding what she reasonably believed to be violations of laws, rules and/or regulations. Specifically, Ms. Ressler

raised complaints regarding the lack of compliance and financial infrastructure for newly launched financial products, premature product launches without accounting, finance, or back-office readiness, and material risk exposures from product initiatives, including risk of duplicate payments, accounting inaccuracies, and tax compliance and regulatory exposure. Further, Ms. Ressler reasonably and in good faith believed if Defendants did not remedy these issues and implement a more accountable leadership structure, it was at risk of additional, imminent violations of law, including securities laws, fiduciary obligations to shareholders, and financial reporting regulations.

161.    Defendants were aware of Plaintiff's protected activities, including, but not limited to, through the strategic risk memo "Scaling Through Structure" she submitted to Defendants' leadership on April 10, 2025 – 13 days before Defendants terminated her employment.

162.    Defendants violated the NYLL by taking adverse actions against Plaintiff because of her protected activities, including, *inter alia*, silencing, marginalization, and ultimately terminating her employment within 13 days of her last protected disclosure on April 10, 2025.

163.    Defendants' actions were willful, malicious or wanton and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

164.    Plaintiff is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**SEVENTH CAUSE OF ACTION**
**Retaliation in Violation of**
**New York City Human Rights Law (N.Y.C. Admin. Code §§ 8-101 *et seq.*)**

165.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

166.    Plaintiff engaged in protected activities under the NYCHRL, including by disclosing her pregnancy and taking maternity leave.

167.    Defendants were aware of Plaintiff's protected activities.

168.    Defendants violated the NYCHRL by taking adverse actions against Plaintiff because of her protected activities, including by, *inter alia*, reassigning her duties, business units and reports, marginalizing and undermining her, excluding her, demeaning her to her team and leadership, and ultimately terminating her employment following her return from maternity leave.

169.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

170.    Plaintiff is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of**
**New York State Human Rights Law (N.Y. Exec. Law §§ 296 *et seq.*)**

171.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein

172.    Plaintiff engaged in protected activities under the NYSHRL, including by

36

disclosing her pregnancy and taking maternity leave.

173.    Defendants were aware of Plaintiff's protected activities.

174.    Defendants violated the NYSHRL by taking adverse actions against Plaintiff because of her protected activities, including by, *inter alia*, reassigning her duties, business units and reports, marginalizing and undermining her, excluding her, demeaning her to her team and leadership, and ultimately terminating her employment following her return from maternity leave.

175.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

176.    Plaintiff is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## NINTH CAUSE OF ACTION
### Defamation

177.    Defendants made false statements about Ms. Ressler in a press release published one day after Defendants terminated her employment. These statements impugned Ms. Ressler in her trade, business and/or profession. Indeed, someone she does not know commented on Ms. Ressler's personal social media account, referring to the press release (emphasis added): "what *illegal activities* did you to to do to get fired from REAX publicly?? . . ."

178.    Thus, the defamatory statements made by Defendants are false and actionable *per se*.

179.    Defendants' false public statements about Ms. Ressler's dismissal referencing the Company's "opinion" that she violated its policies without any factual recitation regarding the

basis of that "opinion" and reference to an ongoing review, implies that the "opinion" is based on facts undisclosed to the reader.

180.    Thus, the defamatory statements are also actionable as mixed opinion.

181.    Ms. Ressler is entitled to compensatory and actual damages for impairment of her reputation and standing in the business community, in an amount to be determined by the trier of fact.

182.    Defendants' defamatory statements were made maliciously, and with wanton and/or reckless, and/or in willful, disregard for Ms. Ressler's rights, and therefore Ms. Ressler is entitled to punitive damages, in an amount to be determined by the trier of fact.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Ressler seeks the following relief:

A.  A declaration that the acts, practices, and omissions complained of herein are unlawful and violate the FMLA, the NYCHRL, the NYSHRL, the NYPFL, the NYLL, and state common law;

B.  Back pay and front pay for past and future lost wages and benefits;

C.  Compensatory damages for, among other things, reputational harm, emotional distress, and the loss of employment, compensation, and benefits;

D.  Punitive damages;

E.  Liquidated damages;

F.  Pre-judgment interest (continuing to accrue at a rate of 9% per year);

G.  Post-judgment interest;

H.  The reasonable attorneys' fees and costs of this action; and

I.  Such other and further relief as this Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Ressler demands a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
       June 10, 2025

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
Allison L. Van Kampen
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: avankampen@outtengolden.com

*Attorneys for Ms. Ressler*