**OUTTEN & GOLDEN LLP**
Allison L. Van Kampen
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **MICHELLE RESSLER,**<br><br>**Plaintiff,**<br><br>v.<br><br>**THE REAL BROKERAGE INC. and REAL BROKER LLC,**<br><br>**Defendants.** | **CASE NO. 1:25-CV-04863-AT**<br><br>**FIRST AMENDED COMPLAINT**<br><br><u>**Demand for Trial by Jury**</u> |

Plaintiff Michelle Ressler ("Ms. Ressler" or "Plaintiff"), by and through her attorneys, Outten & Golden LLP, brings this action against Defendants The Real Brokerage Inc. (NASDAQ: REAX) and Real Broker LLC (collectively, "the Company," or "Defendants"), and hereby alleges and complains as follows:

<u>**NATURE OF THE ACTION**</u>

1.      Ms. Ressler, the former Chief Financial Officer ("CFO") of Defendants, is a 40-year-old Black woman and first-time mother to a ten-month-old baby girl. For the past 18 years, Ms. Ressler has worked tirelessly to establish herself as a senior finance and operations executive in the historically male-dominated financial services and real estate technology industries. Defendants, without basis, cast aspersions on Ms. Ressler's unblemished track record by firing her just three months after she returned from maternity leave, giving her CFO role to her less qualified male subordinate, and issuing a defamatory press release about it.

1

2.    Ms. Ressler has been the architect behind companies becoming ***companies*** – not just startups with potential, and Defendants were no exception. Under her leadership, in less than five years, the Company grew from a fledgling startup to a major player in the real estate technology sector. When Ms. Ressler joined the Company in July 2020, it had just $16 million in annual revenue; today, the Company is the fastest-growing national real estate brokerage with over $1.3 billion in annual revenue, operating at scale across the US and Canada. Suffice it to say, without Ms. Ressler's strategy, vision, and execution, the Company would not be what it is today.

3.    Rather than reward Ms. Ressler for her unwavering dedication and hard work, Defendants decided to get rid of her because she started a family and dared to challenge the Company's questionable and potentially unlawful conduct. Astonishingly, Defendants' male Chief Executive Officer ("CEO") Tamir Poleg less than subtly suggested that Ms. Ressler could not be both an effective and dedicated CFO and a mother, stating to her during pre-maternity leave discussions about her future at the Company when she was living and working in New York City, "***We'll see how you feel after you have the baby, you might find that your priorities change***" and "***Don't underestimate how hard this is going to be once you've had the baby***."

4.    Acting on their admitted bias, from her pregnancy disclosures in January 2024 through her termination on April 23, 2025, Defendants executed a steady campaign to sideline and ultimately oust Ms. Ressler for pretextual reasons so it could give her CFO role to an unencumbered man. Within weeks of her pregnancy announcement, the Company began permanently reassigning her core business units to men and women without babies, with no intention of returning them to Ms. Ressler. While she was on protected leave, Defendants launched noncompliant products without her input and exploited her absence to diminish her role

2

and standing within the Company, and, relatedly, positioned her less qualified male subordinate – who she hired and trained, Ravi Jani – to replace her as CFO. Indeed, during her leave, CEO Poleg promised Mr. Jani the CFO role and asked Mr. Jani to "trust him" that the promotion was coming.

5.    On August 15, 2024, Ms. Ressler gave birth to a beautiful baby girl and commenced maternity leave. She went into her leave after expressing serious concerns about the Company's future, including compliance and legal exposure stemming from CEO Poleg's decisions to prematurely launch products that, put simply, did not work. Within weeks of her daughter's birth, Defendants began interfering with Ms. Ressler's protected leave by asking her to attend and present at Board meetings, attend team meetings and employee interviews, take calls, and be responsive on email. Ms. Ressler did what Defendants asked, putting the business ahead of her newborn. She even attended meetings and participated in calls when she was still recovering from childbirth and while nursing and pumping breast milk for her daughter.

6.    When Ms. Ressler returned from maternity leave on January 21, 2025, her job was a fraction of her already diminished role. Defendants failed to restore her business units that they reassigned pre-leave, and, as before, Defendants continued marginalizing her, excluding her from key decisions, systematically undermining her authority, and scapegoating her for leadership failures beyond her control. Defendants also continued to ignore her risk reports about the Company's increasingly problematic actions. By this time, it was even more clear that Defendants planned to fire Ms. Ressler, it was just a matter of when. First, the Company needed to manufacture a reason that it could spin as misconduct and, relatedly, sell to the Board to mask the Company's discriminatory and retaliatory decision to remove its high-performing CFO.

7.    Within around three months of her return from maternity leave, on April 23, 2025,

Defendants abruptly terminated Ms. Ressler's employment. During the meeting, CEO Poleg read aloud from the termination letter: Ms. Ressler was being dismissed "for cause" based on "gross misconduct," specifically that an "internal audit" revealed her "improper use of the Company's bank card" based on eight personal charges that were incurred between March and July 2024 totaling $17,440.60, specifically $15,946.80 in airfare and $1,493.80 in entertainment expenses that were not even personal but rather related to networking in her capacity as CFO. CEO Poleg then threatened Ms. Ressler, stating that a criminal investigation of her "theft" of Company funds was coming. Meanwhile, employees across the Company not in Ms. Ressler's situation freely used the corporate card for personal expenses, and male C-suite executives in particular, notably the CEO who fired Ms. Ressler, regularly charged personal expenses to the Company card.

8.      Ms. Ressler was blindsided. The Company never had a conversation with her about the charges it was using to fire her. When she tried to explain that the entertainment charges were business related and the airfare charges were accidental and offered to repay the Company, CEO Poleg dismissed Ms. Ressler.

9.      Of course, Defendants failed to discipline, let alone fire, male executives who engaged in similar or worse behavior. CEO Poleg, for instance, charged to his Company card substantial amounts for a family vacation, yet faced no discipline. Other male leaders routinely failed to document their expenses to show that they were business related versus personal, without consequence. Only Ms. Ressler was singled out, investigated, abruptly terminated, and then defamed in a press release.

10.     Plaintiff brings this action to remedy discrimination and retaliation, in violation of: the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601 *et seq*.; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290 *et seq*.; the New York City Human

Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*; the New York State Paid

Family Leave Law ("NYPFL"), 12 NYCRR §§ 380 *et seq.*; and the New York Labor Law

("NYLL"), § 740. She further brings a claim against Defendants for defamation under New York

common law.

11.     As a result of the Company's discrimination, retaliation, defamation, and other

violations of law, Ms. Ressler has suffered significant harm, including, but not limited to, loss of

employment, reputational damage, emotional distress, humiliation, and millions of dollars in lost

wages and benefits.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Michelle Ressler is a Black adult woman and former employee of The

Real Brokerage Inc. and subsidiary Real Broker LLC within the meaning of all applicable

statutes.

13.     Ms. Ressler was the Vice President ("VP") of Finance and later the CFO of all of

Defendants' entities, including The Real Brokerage Inc. and Real Broker LLC.

14.      Defendants operate as a remote company, allowing employees to work from

various locations across the United States and internationally. Nevertheless, Defendants employ

many individuals in New York – including Ms. Ressler, who worked primarily from New York

during most of her tenure before Defendants terminated her employment – and Defendants

conduct regular business within New York State, particularly in New York City.

15.     During a majority of her employment with Defendants, Ms. Ressler worked and

lived in New York City.

16.     Ms. Ressler lived and worked (primarily from her home) in New York City from the start of her employment in 2020 through October 25, 2024, including the time period during which she announced her pregnancy and intention to take leave, Defendants required her to work during her protected maternity leave, and when she suffered discrimination and retaliation based on her pregnancy, maternity leave, and her decision to speak out about mismanagement and potential financial misconduct at the Company.

17.     While Ms. Ressler had to travel for work during her employment as CFO, New York City was her primary workplace and her home base.

18.     From the start of her employment through 2024, Ms. Ressler paid New York State and City taxes.

19.     While Ms. Ressler spent time in Paris and traveling in Europe from October 25, 2024 through March 2025, she continued to travel to New York during this period, and never became a citizen of or resided in any jurisdiction other than New York.

20.     Up until October 31, 2025, Ms. Ressler maintained a residence in New York City. Ms. Ressler's partner (and the father of her child) maintained a residence in his name in Brooklyn until March 2025.

21.     Ms. Ressler temporarily moved to Norway on or about April 1, 2025 to be closer to her baby's paternal grandparents who assist with childcare. She has plans to return to New York when her daughter is no longer an infant, possibly earlier if her efforts to secure employment in New York are successful.

**Defendants**

22.     Defendant The Real Brokerage Inc., a publicly traded company on the Nasdaq, a New York City based stock exchange, is a cloud-based real estate brokerage that operates

entirely online and provides real estate agents with technology and support.

23.    Defendant The Real Brokerage Inc. is licensed to do and does business in New York.

24.    The Real Brokerage Inc. was incorporated in British Columbia in 2018 and currently has headquarters in Miami, Florida and Toronto, Canada.

25.    The Real Brokerage Inc. is the parent company of various entities, including subsidiary Defendant Real Broker LLC, the entity which employs Defendants' workforce in the United States. Real Broker LLC is a corporation duly formed and existing under the laws of the State of Texas, with a principal place of business located at 600 Mamaroneck Avenue #400, Harrison, New York 10528.

26.    During all relevant times, Defendants were Plaintiff's employer within the meaning of all applicable statutes.

27.    During all relevant times, Defendants had more than fifty (50) employees.

## JURISDICTION AND VENUE

28.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action alleges violations of a federal statute.

29.    This Court has supplemental jurisdiction over this action, pursuant to 28 U.S.C. § 1367(a), because, as stated above, this Court properly has federal question jurisdiction and Ms. Ressler's other claims are so closely related to her claims within this Court's original jurisdiction such that they form part of the same case or controversy under Article III of the United States Constitution.

30.    Venue lies in this judicial district pursuant to 28 U.S.C. § 1391(b)(2)-(3), (d) because a substantial part of the events or omissions giving rise to this action, including the

unlawful employment practices alleged herein, occurred within the Southern District of New York, and Defendants are subject to the Court's personal jurisdiction with respect to this action, as Defendants employed Plaintiff in New York, New York, and Plaintiff felt the impact of Defendants' unlawful actions in New York, New York.  Further, Ms. Ressler's July 2020 Offer Letter incorporates a choice of law provision providing that she and Real Broker LLC "irrevocably consent to the venue and exclusive personal jurisdiction of the U.S. District Court for the District of New York sitting in NYC."

31.     On June 10, 2025, Ms. Ressler filed a Charge of Discrimination ("the Charge") with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex, including pregnancy, and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. §§ 2000e *et seq*. and the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). The Charge was cross-filed with the New York City Commission on Human Rights. On July 17, 2025, Plaintiff requested her Notice of Right to Sue from the EEOC. When Plaintiff receives that Notice, she will seek to amend the Complaint a second time to add her Title VII and PDA claims. The facts set forth herein support those claims as well, and therefore there will be no prejudice to Defendants by this procedure.

## FACTUAL ALLEGATIONS

### Ms. Ressler's Background and Employment with Defendants

32.     Ms. Ressler, a 40-year-old Black woman and mother, is a highly successful, well-known, and respected senior finance and operations leader in the financial services and real estate technology space.

33.     Over the past 18 years, she has earned a reputation as a capable and multifaceted executive who can successfully build and scale companies from early-stage ventures to

operational maturity. Ms. Ressler did just that during her over four years at Canaccord Genuity Inc., and again during her nearly five years with Defendants.

34.    Defendants are a cloud-based digital brokerage platform that provides technology and support for real estate agents, including real estate, mortgage, and closing services.

35.    When Defendants hired Ms. Ressler, the Company was a floundering startup that lacked core operational and finance infrastructure. When she joined as VP of Finance in July 2020, the Company was a nine-person startup with less than $1 million on its balance sheet, was struggling to process 25 weekly commission payments, and had roughly 1,100 agents (*i.e.*, clients). Today, Defendants process roughly 1,000 commission payments **per day** and boast over 28,000 agents.

36.    Within her first few months, Ms. Ressler introduced financial discipline, scalable infrastructure, and rebuilt critical operational processes from the ground up. She architected the core of Defendants' "trading floor" strategy, now known as the reZEN platform, which brought order, transparency, and speed to the transaction process. In recognition of her early and extraordinary impact, Defendants promoted Ms. Ressler to CFO on October 15, 2020, after just three months at the Company.

37.    In the years that followed, Ms. Ressler built and scaled seven of Defendants' ten critical business functions, specifically Finance & Accounting ("F&A"), Financial Planning & Analysis ("FP&A") and Investor Relations, Internal Audit, Transactions, Human Resources ("HR"), Legal (until the Company hired a General Counsel), and India Operations; advised on strategy; and otherwise led far beyond the scope of a typical CFO. She played an instrumental role in Defendants' rapid growth by, *inter alia*, overseeing multiple strategic acquisitions and a major geographic expansion across the US and Canada and helping drive annual revenues from

$16 million when she joined to over $1.3 billion in four years.

### Following Ms. Ressler's Pregnancy Disclosures, Defendants Engaged in Immediate Discrimination and Retaliation, Which Persisted Upon Her Return from Leave

#### A. Discriminatory Comments

38.    Ms. Ressler first learned that she was pregnant with her first child in December 2023. After confirmation that the pregnancy was viable, in January 2024, Ms. Ressler told leadership about her pregnancy and intended FMLA/maternity leave in August 2024, specifically CEO Mr. Poleg, and later, President Sharran Srivatsaa, Chief Operating Officer ("COO") Jenna Rozenblat, Chief Technology Officer ("CTO") Pritesh Damani, Chief Marketing Officer ("CMO") Andrea Madden, and Chief Legal Officer ("CLO") Alexandra Lumpkin.

39.    Following her pregnancy disclosures (and also upon her return from maternity leave), male leadership made numerous comments evidencing discriminatory animus, including those rooted in unlawful gender stereotypes.

40.    Ms. Ressler announced her pregnancy when she was living and working in New York. CEO Poleg's discriminatory comments as described below were made during calls and/or virtual meetings with Ms. Ressler when she was in New York, New York.

41.    In February 2024, when discussing her role and future at the Company, CEO Poleg stated to Ms. Ressler, "We'll see how you feel *after you have the baby*, you might find that your priorities change."

42.    In March or April 2024, during a discussion about Ms. Ressler's business units, equity, and role within the Company, CEO Poleg stated to her, "We'll see how things are later in the year *after you have the baby*."

43.    In July 2024, one month before she was scheduled to commence maternity leave,

CEO Poleg cautioned Ms. Ressler, "***Don't underestimate how hard this is going to be once you've had the baby***."

44.     Following her return from maternity leave on January 21, 2025, in March 2025, Board member Guy Gamzu less than subtly encouraged Ms. Ressler to resign and pursue other opportunities, tying his "advice" to her motherhood, stating: "Maybe your sweet spot is not in a company that is larger, but in a small startup that you can grow and bring to scale. Life is going to change, and it will always get more beautiful, ***now you have [your daughter] and you should focus on that***."

**B.  The Company's Discrimination and Retaliation Extended Well Beyond Direct Comments**

45.     After Ms. Ressler disclosed her pregnancy and intended leave, the Company swiftly commenced a discriminatory campaign to push Ms. Ressler out as CFO, and, relatedly, manufacture a reason to terminate her employment for Cause. In the lead-up to and during Ms. Ressler's maternity leave from August 15, 2024 through January 21, 2025, and upon her return from leave, Defendants progressively (and permanently) reassigned her duties, business units and reports, marginalized and undermined her, excluded her, and demeaned her to her team and leadership.

**(1)  Business Unit Reassignment(s)**

46.     Right before her pregnancy disclosures, as of January 2024, Ms. Ressler oversaw the following business units: (1) Finance & Accounting; (2) Investor Relations and FP&A; (3) US Transactions; (4) Canada Payments and Settlements; (5) HR; (6) Internal Audit; and (7) Real India.

47.     Shortly after her pregnancy announcement, at which time Ms. Ressler was living and working in New York City, Defendants began permanently reassigning her business units

and other oversight responsibilities. These discriminatory and retaliatory reassignments occurred in a methodical sequence – Canada Settlements in February 2024, US Transactions in August 2024, HR in December 2024, and Internal Audit in January 2025 – corresponding closely with her pregnancy disclosure in January 2024, maternity leave commencing on August 15, 2024, and anticipated return from leave on January 21, 2025. The temporal proximity of Defendants' actions demonstrate that the early erosion of Ms. Ressler's role was always intended to be permanent. This is especially true, since the Company failed to restore any of Ms. Ressler's business units when she returned from maternity leave.

48.     On information and belief, shortly after Ms. Ressler announced her pregnancy (and in connection with concerns that she raised in the following months over potential mismanagement, noted *infra* at ¶¶ 58-62), Defendants decided to permanently diminish Ms. Ressler's role, sideline her work, and ultimately terminate her employment. Defendants' decision is evidenced by CEO Poleg's violation of his agreement to cover on a temporary basis Ms. Ressler's responsibilities while she was on leave (*see infra* at ¶¶ 54-56), and Defendants' concerted and systematic dismantling of Ms. Ressler's job responsibilities, which were never restored, notwithstanding that she continued to work while on maternity leave and later returned as a full-time employee. Ms. Ressler was living and working in New York City for the majority of the relevant period, and she felt the impact of Defendants' decision to diminish, sideline and gradually terminate her employment in New York City.

49.     In February 2024, just one month after she told CEO Poleg about her pregnancy, he announced that the Company was removing Canada Settlements from Ms. Ressler's purview (*i.e.*, Finance) and assigning it to COO Ms. Rozenblat, who was not a new mom. Defendants effectuated this adverse action in March or April 2024, when Ms. Ressler was living and

working in New York City.

50.     The same day Ms. Ressler commenced FMLA/maternity leave (August 15, 2024),
at which time she was living in New York City, Defendants moved US Transactions out of
Finance and into Operations under COO Ms. Rozenblat.[1] Because Defendants required Ms.
Ressler to continue working during her maternity leave when she was in New York, she likewise
felt the impact of this adverse action while living and working in New York City, including the
diminishment of her responsibilities and authority, damage to her professional reputation and
standing within the Company, and exclusion from business decisions within her purview as
CFO, including those that put the Company at risk.

51.     Later, right before her scheduled return from maternity leave, Defendants
assigned HR to Dipti Salopek (a new hire, who was not a new mom) in December 2024, and
Internal Audit to CLO Ms. Lumpkin, who does not have children, in January 2025.

52.     While Ms. Ressler was traveling in Europe and specifically Paris at this time, she
and her partner maintained a New York City residence, continued to travel to New York City,
and Ms. Ressler felt the impact of the discriminatory and retaliatory removal of her oversight for
Defendants' HR and Internal Audit business units in New York, including during her business
trip to New York in late January 2025. During that trip, it was even more clear to Ms. Ressler
and the Company at large that Defendants had no intention of restoring her oversight for any of
the business units she handled before she announced her pregnancy, and instead were continuing
to diminish her responsibilities and authority, and that she had otherwise fallen out of favor with
Company leadership and her employment was at risk. This caused harm to Ms. Ressler's

---

[1] This reassignment became effective January 1, 2025, just three weeks before Ms. Ressler returned from leave.

professional reputation, emotional wellbeing and standing with the Company, which she felt in New York, New York.

53.     On information and belief, in late November or early December 2024, CEO Poleg promised Mr. Jani the CFO role and asked Mr. Jani to "trust him" that the promotion was coming. Also, at year-end 2024, Defendants awarded Mr. Jani substantial equity in the Company.

### (2) Defendants Groomed Ms. Ressler's Male Replacement, Excluded and Marginalized Her, and Ignored Her Reports of Legal and Compliance Risks

54.     During coverage discussions before she commenced maternity leave, Ms. Ressler and CEO Poleg agreed that he would step in as manager to Ms. Ressler's team and oversee her (remaining) business units in her absence, with the understanding that she would reassume oversight of her business units when she returned from leave.

55.     Contrary to the agreed coverage plan, Defendants began grooming Ms. Ressler's male subordinate, then VP of Investor Relations and FP&A Mr. Jani, to take over as CFO, by assigning him many of Ms. Ressler's CFO functions in the lead up to and during her maternity leave commencing on August 15, 2024. Ms. Ressler was living and working in New York City when many of these adverse actions took place.

56.     For example, beginning in May 2024 before Ms. Ressler even commenced leave, per CEO Poleg, Mr. Jani began attending all board meetings **and** directing Ms. Ressler's core business units, including, but not limited to, Finance & Accounting. This occurred while Ms. Ressler was living and working in New York City, and it impacted her employment in New York by reducing her responsibilities and authority and smearing her standing within the Company.

57.     Despite her concerns about the Company's preferential treatment towards Mr. Jani and what it could mean for her job security, during the months leading up to her maternity

leave, she worked tirelessly from New York (when not traveling for work) to position Defendants for success in her absence, including by imploring leadership to address mounting operational and compliance problems that threatened the business.

58.     In June 2024, from her home office in New York City, Ms. Ressler reported the following issues to CEO Poleg: *inter alia*, a lack of compliance and financial infrastructure for newly launched financial products; premature product launches without accounting, finance, or back-office readiness; and material risk exposures from product initiatives, including risk of duplicate payments, accounting inaccuracies, and tax compliance and regulatory exposure. CEO Poleg in response refused to acknowledge any of these issues as serious and declined to work with Ms. Ressler on ways to fix them.

59.     Instead, the Company used Ms. Ressler's complaints and concerns over financial, regulatory and compliance-related risks as further grounds for reducing her role and authority and ultimately terminating her employment. Defendants' failure to heed her credible warnings and retaliation against her for reporting potential unlawful conduct occurred when Ms. Ressler was living and working in New York and otherwise impacted her employment in New York.

60.     Ms. Ressler did not give up. In July 2024, the month before she commenced maternity leave, at which time Ms. Ressler was living and working in New York City, with support from her Chief of Staff, Ms. Ressler presented to CEO Poleg and CTO Mr. Damani a comprehensive report outlining multiple product-related issues that compromised financial integrity, raised compliance and regulatory concerns, and posed significant risk to the Company.

61.     As before, male leadership refused to acknowledge the risks and instead doubled down, responding with antagonism and painting Ms. Ressler as the problem for getting in the way. They also refused Ms. Ressler's requests for the resources needed to address and remedy

the issues. Shortly after that combative meeting, Ms. Ressler's Chief of Staff resigned without another job.

62.     Also in July 2024, Ms. Ressler specifically asked to participate in a strategy discussion with the CEO and CTO to identify how to stand up the necessary compliance and control functions – whether through internal resources or external consultants – without slowing product velocity. They ignored her request for a meeting.

63.     Ms. Ressler began her statutory maternity leave soon after, on August 15, 2024, rightly concerned about what would happen if leadership continued to ignore the core operational, regulatory, and legal risks she had reported. Ultimately, at least some of the issues Ms. Ressler raised in July 2024 were addressed during her leave, albeit only because of pressure from the Board, validating Ms. Ressler's concerns and underscoring the discriminatory and retaliatory nature of male leadership's aggressive and dismissive response to them.

64.     Ms. Ressler spent a substantial part of her maternity leave, including just shy of 11 weeks (specifically August 15 through October 25, 2024) of her 12-week protected leave under the FMLA and NYPFL, in New York City and thus felt the impact of Defendants' actions described herein in New York, New York.

### Defendants Interfered with Ms. Ressler's Protected Leave, While Also Exploiting Her Leave to Position Her for Dismissal

65.     Defendants required Ms. Ressler to work during her leave, when it suited them at least. Defendants asked Ms. Ressler to attend and present at Board meetings (because Mr. Jani was not qualified to do so), attend team meetings, and participate in employee interviews, albeit not for C-Suite positions, *see* ¶¶ 79-80, *infra*. Defendants also expected Ms. Ressler to take calls and be responsive on email during her protected leave.

66.     Despite requiring her to work and otherwise be "plugged in" during her leave,

Defendants selectively and strategically excluded Ms. Ressler from meetings and communications (including despite her express requests to participate) when her involvement risked derailing Defendants' plan to fire Ms. Ressler when she returned from leave and elevate Mr. Jani into her CFO role. Further, even though Defendants knew that Ms. Ressler was just a call or email away, they intentionally kept Ms. Ressler in the dark and made numerous decisions that further diminished the scope of her role, and impacted Defendants' finances (Ms. Ressler's core responsibility as CFO), compliance, and the overall future of the Company she helped build.

67.    For example, without letting its CFO know, Defendants sourced, negotiated, and in February or early March 2025 (when Ms. Ressler was back at work) sent a Letter of Intent ("LOI") for an acquisition. While Defendants failed to inform CFO Ms. Ressler of this major business decision, they included her male subordinate Mr. Jani in discussions about the LOI during and after her leave.

68.    Although she and her team had presented a five-year financial target plan to the Board in July 2024, Ms. Ressler had no meaningful role in building the actual 2025 budget. Instead, Defendants limited her participation to two brief conversations, which occurred while Ms. Ressler was living and working in New York City, in which she suggested cuts and called out formula errors – proposed changes male leadership ignored. In late 2024, CEO Poleg and Mr. Jani presented the 2025 budget, which was prepared without meaningful CFO input. Prior to her maternity leave, Ms. Ressler was integral in building and presenting Real's annual budgets.

**A. The Real Wallet Disaster; Other Mismanagement by Male Leadership**

69.    Per Company policy and standard industry practice, the CFO is required to review and approve any product with financial impact. Yet, during Ms. Ressler's maternity leave which she substantially spent in New York City, and despite asking her to work on less significant

matters, Defendants bypassed her and this critical control, resulting in material failures and potential violations of law.

70.     Defendants' seminal, regulated product is Real Wallet, a banking and lending product for real estate agents. According to Defendants' website,[2] US Agents should think of Real Wallet as "as your personal financial powerhouse—a debit account that's seamlessly tied to your commission income and revenue share. The game changer? You'll have access to your money **days faster** than traditional banks. No more waiting on the sidelines for your commission to clear."

71.     Contrary to policy and standard practice, and even though Defendants knew Ms. Ressler was working because they required it, in October 2024 (when Ms. Ressler was living in, and despite her protected leave forced to work from, New York City), the Company announced the launch of Real Wallet without CFO Ms. Ressler's review, approval, or even notice – ***and knowing that the product did not work***. Among other issues, the prematurely launched product did not comply with the underlying legal agreements, had no back-office compliance or financial infrastructure, and was nonfunctional in Canada.

72.     When Ms. Ressler raised concerns about these issues upon her return from maternity leave during a business trip to New York in late January 2025, CEO Poleg dismissed her with a telling remark: "I'm worried we are beginning to slow down." In context, his message was unmistakable: Defendants needed to impress investors with flashy, attention-grabbing product launches – even if the products were nonfunctional or noncompliant – to distract from the Company's mounting operational risks and inability to generate sustainable profit margins

---

[2] *What is Real Wallet?* THEREALBROKERAGE.COM, https://support.therealbrokerage.com/hc/en-us/articles/27222653693847-What-is-Real-Wallet (last accessed June 6, 2025).

through its revenue diversification strategy. While at the time Defendants enjoyed top-line growth, the Company's stock had dropped by 25%, its ancillary products (Mortgage and Title) were underperforming, and it had just announced a stop work on its consumer platform. Defendants needed momentum, and Ms. Ressler's insistence on controls and compliance was inconvenient – even though it was entirely correct.

73.    Real Wallet's fundamental failures continued post-launch, including duplicate commission and loan disbursements, the inability to recollect funds, and blackout periods caused by improper system updates that prevented commission payments from processing. If left unaddressed, these issues exposed Defendants to operational and regulatory risk.

74.    Days before her unlawful dismissal, on April 21, 2025, Ms. Ressler again flagged serious concerns about Real Wallet's malfunctions. Real estate agents were not repaying the advanced funds they received (a 21% delinquency rate) and as a result the Company was risking substantial losses by extending the program, *i.e.*, increasing the amount of money advanced to agents, without sufficient funds to do so. To address this issue, Ms. Ressler told Defendants they needed to fix the product before expanding the program and take an expected credit loss (ECL) reserve. Defendants refused because, put simply, it would look bad to investors.

75.    In a financial statement review meeting the same day (April 21), when Ms. Ressler reiterated Defendants' need for the reserve, Defendants' Controller responded, "Ravi [Jani] does not want to take one." Clearly, by that time, Mr. Jani was already making unilateral CFO-level decisions.

76.    Despite knowing that Real Wallet remained nonfunctional and unprofitable, evidenced by the rising delinquency rate, CEO Poleg nevertheless pushed to scale the program by soliciting funds from agents and issuing loans against them, exposing the Company to

financial risk nearing 70% of its balance sheet.

77.    Defendants followed the same reckless approach with the Company's Mortgage Early Commission Payments product ("Mortgage") – another flawed regulated product with fundamental problems that CEO Poleg prematurely launched anyway. The purpose of this product is disbursing funds ahead of close across a platform projected to process over 150,000 transactions in 2025.

78.    Pre-launch, in or around April 2025, Ms. Ressler raised with leadership what needed to be done to "fix" that product and bring it into compliance, including proper accounting treatment, and expressly questioned whether Defendants conduct vis-à-vis Mortgage violated the law, including the Real Estate Settlement Procedures Act (RESPA). CEO Poleg dismissed her, tried to downplay her concerns as pedantic, stating, "***We can't hold the launch for accounting entries***," and proceeded with the Mortgage launch anyway.

**B.  Exclusion from Hiring Decisions**

79.    Even though Defendants required Ms. Ressler to work and knew she was "plugged in" during her leave (which she substantially spent in New York City, including just shy of 11 weeks of her 12-week statutory leave under the NYPFL and FMLA), CEO Poleg intentionally excluded her from hiring discussions for two C-suite roles – Chief Human Resources Officer ("CHRO") and Chief Information Officer ("CIO").

80.    Regarding the CHRO, prior to her protected leave, Ms. Ressler oversaw the HR function. As to both hirings, prior to her leave, CFO Ms. Ressler was involved in all leadership hiring decisions. And yet, early on in her maternity leave when Ms. Ressler was living in New York, CEO Poleg unilaterally hired a CHRO without consulting Ms. Ressler (other than to communicate his already made decision) – breaking with past practice and further diminishing

Ms. Ressler's role and standing within the Company.

81.    The CHRO was then directed to report to the CEO, not Ms. Ressler – a superficial change to knock Ms. Ressler down yet another rung. Specifically, upon her return from maternity leave in January 2025 and continuing for three months (*i.e.*, right up until her unlawful dismissal on April 23, 2025), Ms. Ressler (not the CEO) functioned as the CHRO's primary leader and point of contact, guided her onboarding and provided strategic direction.

### Defendants' Escalating Mistreatment Upon Ms. Ressler's Return from Maternity Leave and in Response to Her Risk Reports

82.    When Ms. Ressler returned from maternity leave on January 21, 2025, her job was a fraction of her already diminished role. Notably, while framed as temporary before she went out on leave, none of Ms. Ressler's business units were restored to her oversight. She also came back to a mess in terms of Defendants' finance operations. Additionally, there was a distinct shift in Defendants' attitude towards Ms. Ressler, which sent a clear message – she was no longer welcome, had fallen out of favor with leadership, and was otherwise a pariah.

83.    Defendants' effort to oust Ms. Ressler because of her pregnancy, stated intention to take maternity leave and reports of potential unlawful conduct through diminishing her role, standing and authority, and positioning Mr. Jani to replace her, began before and continued during Ms. Ressler's maternity leave, and she felt the impact of these discriminatory and retaliatory actions in New York City, both before, during and after returning from leave.

84.    Immediately upon her return from leave, Ms. Ressler's male subordinate Mr. Jani, who Defendants had already tapped to replace her as CFO, conducted himself like he was already promoted, often engaging in blatant insubordination and marginalization. This included attending high-level meetings in Ms. Ressler's place and meeting directly with her superiors and subordinates, including when Ms. Ressler was in New York for work in late January 2025.

85.     Mr. Jani flagrantly backdoored Ms. Ressler up and down the chain, including presenting to leadership on topics that were unquestionably Ms. Ressler's responsibility as CFO. For example, in February 2025, Mr. Jani presented to the CEO and President[3] FP&A findings – that Ms. Ressler had specifically directed him to prepare for her to present – without consulting or even notifying her. Defendants also asked Mr. Jani to perform various analysis tasks related to expense management and profitability, including a vendor analysis – again, work plainly within Ms. Ressler's purview as CFO.

86.     Also one month following her return from maternity leave, Defendants excluded Ms. Ressler from management discussions for one of her direct reports. Specifically, during a late February 2025 business trip in Dubai, without inviting or even notifying Ms. Ressler, nearly the entire C-suite (CEO, CTO, CHRO, and CLO) met with her direct report, General Manager India, Vivek Patel, to discuss his role and responsibilities. On information and belief, Defendants asked for this meeting to gauge whether Mr. Patel would be a retention risk when Ms. Ressler was no longer CFO and to get his opinion on where the India Operations business unit should live after her departure. Prior to her maternity leave, Ms. Ressler led and was otherwise actively involved in the management of employees working in the business units she oversaw.

87.     During a March 4, 2025 all-hands meeting, President Srivatsaa, when introducing Finance leadership, stated "this is Michelle, our CFO, the leader of finance operations ***alongside Ravi***." This was the first time Ms. Ressler was introduced as a dual leader of Finance, continuing Defendants' systematic pattern of undermining Ms. Ressler and progressively diminishing her role to pave the way for her male successor without children, Mr. Jani, which began following her pregnancy announcement when Ms. Ressler was working and living in New York City.

---

[3] The President stepped down on March 1, with a June 1, 2025 last day.

88.    At the same time, Ms. Ressler began making proposals to leadership to address material structural challenges that put Defendants' operational efficiency and financial integrity at risk, including the CEO's recurring (and unchecked) disregard for financial controls and compliance when launching products. For example, on or about March 4, 2025, Ms. Ressler submitted a governance-level proposal to CEO Poleg, who in turn shared it with two (male) Board members, recommending that Defendants adopt a co-CEO or Operational CEO model to address escalating dysfunction in execution, mitigate compliance and regulatory risk, and increase leadership accountability. CEO Poleg outright refused to discuss her proposal.

89.    Also in March 2025, *i.e.*, about three months post-maternity leave, the Company less than subtly encouraged Ms. Ressler to resign and pursue other opportunities, tying this "advice" to her motherhood. Specifically, Board member Guy Gamzu stated: "Maybe your sweet spot is not in a company that is larger, but in a small startup that you can grow and bring to scale. Life is going to change, and it will always get more beautiful, ***now you have [your daughter] and you should focus on that***."

90.    Mr. Gamzu made this comment encouraging Ms. Ressler to resign in response to Ms. Ressler's reports about Defendants' deficient operating structure, inefficiencies, leadership issues, declining margins, Defendants' breach of lending agreements (mainly terms governing the product development for Real Wallet), and her recommendation for changes to restore oversight and stabilize leadership.

91.    To further position Ms. Ressler's less qualified male subordinate without comparable caregiving responsibilities to succeed her as CFO, on March 31, 2025, CEO Poleg unilaterally "transitioned" (code: promoted) Mr. Jani from VP of IR and FP&A to "VP of Enterprise Strategy" – a new position created just for him. While, based on the job description,

Mr. Jani's duties were the same, he now reported directly to the CEO, not CFO Ms. Ressler.

92.    Growing increasingly concerned about Defendants' future, Ms. Ressler authored, and on April 10, 2025 submitted to the C-suite, a comprehensive strategic risk memo, titled "Scaling Through Structure." This document outlined a proposed organizational realignment to mitigate the growing risk related to undisciplined product launches, cross-functional breakdowns, and gaps in financial oversight. This was a forward-looking risk alert from Defendants' CFO, identifying structural dysfunction that hindered execution and obscured visibility into high-risk product launches, including Defendants' regulated product offerings like Mortgage and Wallet. Her proposal made clear that, absent swift remedial action, Defendants' internal failures threatened to impact financial reporting integrity and investor trust.

93.    Ms. Ressler's sounding the alarm analysis should have, and if she were a man would have, at a minimum, elicited immediate executive and Board engagement. Instead, the Board and C-Suite ignored her risk alert and fired her not even three weeks later.

### Defendants Used an Internal Audit to Set the Stage for Ms. Ressler's Discriminatory and Retaliatory Dismissal

94.    Shortly after Ms. Ressler's return from leave, in early March 2025, Defendants commenced a purportedly urgent internal travel and entertainment ("T&E") audit, nominally as part of a broader internal controls review intended to test systems and processes and relatedly assess operational effectiveness and efficiency in a controlled environment.

95.    In reality, Defendants used this audit to conduct a pretextual deep dive into Ms. Ressler's expenses, under the guise of routine review, to manufacture grounds for termination and clear the way for her less qualified and unencumbered male successor.

96.    The rushed T&E audit revealed institutional problems, including Defendants' need for a corporate credit card use policy and other longstanding issues related to reviewing and

24

processing business expenses, such as: the lack of supporting documentation/receipts for expenses by numerous employees and members of the C-suite; the President approving his own expenses, thereby bypassing any approval or review process; and the historical use of only one or two American Express ("AmEx") cards, which were shared across departments, making it difficult to attribute charges to a specific person or department and assess the business justification for those charges.

97.    Any issues surrounding charges on the corporate AmEx card in Ms. Ressler's name date back to Defendants' earliest stage of operations, when the Company maintained a single "master account" corporate AmEx card, coded as a Purchase Card, to support centralized startup functions. A corporate Purchase Card (also known as a procurement card or P-card) is a type of credit card businesses provide to employees to make company purchases without having to go through a formal approval process for those purchases. This made sense for Defendants when they were a small start-up experiencing fast growth. Accordingly, the AmEx in Ms. Ressler's name was specifically established as a Purchase Card for company-wide use so that employees could make purchases for the budding start-up without the hassle of having to submit expense reports.

98.    As the Company scaled and grew, the "master account" Purchase Card, originally held by Ms. Ressler as CFO, remained embedded in multiple departmental workflows and was used by personnel across teams spanning the entire company, including, but not limited to, Operations, Research & Development, and Marketing. Even though Defendants had clearly outgrown this stopgap expense processing system, it refused to do anything about it.

99.    Beginning in 2022 and continuing when Ms. Ressler was living and working in New York, and most recently in in the weeks leading up to her unlawful dismissal on April 23,

2025, to ensure improved expense tracking and compliance, Ms. Ressler repeatedly asked for approval to close the master AmEx Purchase Card and for her to be issued a new card (with its own account number) for her exclusive use. In making one such request to CEO Poleg in February or March 2025, Ms. Ressler explained that she needed her own card/account because there were thousands of dollars in charges to the corporate AmEx Purchase Card in her name that were not hers. Each time, Defendants refused to close the account and issue her a new card, citing administrative inconvenience and potential disruption.

100.    Beginning in 2023, and most recently in September and October 2024, when Ms. Ressler was working from her home office in New York, she and the Finance team implored leadership to allocate budget and headcount so that it could (finally) transition to a centralized procurement and expense system, as required for a company of its size. Defendants refused, because they did not want to pay for it.

101.    As a result, the Company with full knowledge continued operating with a flawed and non-compliant expense process, which, among other issues, made attributing transactions charged to the master account/Purchase Card in Ms. Ressler's name to her versus the countless others who used it, difficult, if not impossible. Defendants then targeted Ms. Ressler while failing to investigate or discipline any of the other (predominantly male) executives who incurred undocumented or improperly coded charges to the corporate AmEx.

102.    As Defendants intended, the T&E audit finally gave the Company what it had been hoping for ever since Ms. Ressler announced her pregnancy – a superficially serious reason to brand her as distrustful and eligible for immediate termination, and allegedly with Cause.

**Defendants Discriminated Against Ms. Ressler Based on Her Gender and Pregnancy by Terminating Her Employment Without Cause and for Pretextual Reasons**

103.    On April 23, 2025, Defendants terminated Ms. Ressler's employment. In the

meeting attended by the CHRO and CEO, Mr. Poleg opened by reading the termination letter, including rattling off a handful of charges to the widely used corporate AmEx card in Ms. Ressler's name, totaling $17,440.60, specifically $15,946.80 in airfare and $1,493.80 in entertainment expenses. CEO Poleg then threatened Ms. Ressler, stating that a criminal investigation of her "theft" of Company funds was coming. Then the CHRO announced that Ms. Ressler's employment was being terminated for Cause, effective immediately.

104.    Ms. Ressler tried to explain that the entertainment charges were work-related, and even so, immediately offered to repay the Company for the full amount it claimed were personal charges. Defendants had no interest in Ms. Ressler's explanation or offer; they had long before decided that they needed Ms. Ressler gone because of her motherhood and her reporting of potentially unlawful conduct, and so the Company could award her male subordinate Mr. Jani the promotion to CFO it promised him during Ms. Ressler's maternity leave.

105.    The eight charges totaling around $17,400 that the Company used to create the appearance of a nondiscriminatory and nonretaliatory reason were either not personal – the entertainment charges were for Ms. Ressler, but in the context of outings with business associates as part of her role as CFO – or, regarding the airfare, unintentional, immaterial, and otherwise an oversight. This oversight was explainable and in fact stemmed from a problem Defendants created, as they refused Ms. Ressler's repeated requests for an administrative assistant, thus requiring CFO Ms. Ressler to book and pay for her own business-related travel, accommodations, and investor-focused events and entertainment.

106.    Meanwhile, CEO Mr. Poleg played fast and loose with the Company's money generally and specifically when it came to charging personal expenses to the business, yet suffered no discipline. As just one example, CEO Poleg (giving him the benefit of the doubt,

inadvertently) charged substantial personal expenses to his corporate AmEx during a family

vacation in Dubai just weeks before Defendants fired Ms. Ressler, allegedly for Cause, for

inadvertently charging much less to her company credit card.

107.    Additionally, by his design, CEO Poleg's use of Company funds for his expenses

was a black box and inherently comingled. He routed all of his travel (business and personal)

through a third-party agency, paid by the Company's Israeli subsidiary, ***bypassing the***

***Company's internal approval processes entirely***. His travel and accommodation charges were

not visible to Finance and were simply consolidated into Defendants' "P&L" (Profit and Loss

Statement) – further shielding his own spending from oversight. By comparison, Defendants

scrutinized each and every expense of CFO Ms. Ressler – evidencing a gender-based double

standard.

108.    Further demonstrating Defendants' differential treatment, while Ms. Ressler

consistently acted with the utmost integrity and was never previously faulted or questioned about

any performance issue prior to her unlawful dismissal (and the alleged misconduct the Company

cited to fire her was not serious), Mr. Poleg's record as CEO is hardly clean. He engaged in,

without consequence, various forms of misconduct and conduct that was detrimental to the

business – much worse than Ms. Ressler's alleged terminable conduct – *inter alia*, rushing

product launches without required infrastructure and systems (or even a functioning product),

refusing to consider Ms. Ressler's (and others') informed advice on Defendants' risk and

legal/regulatory exposure, and ousting CFO Ms. Ressler without Cause or any semblance of due

process for a bogus reason so that Defendants could put an unqualified man in her role, and,

relatedly, publishing a defamatory press release about her departure that harmed both Ms.

Ressler's and Defendants' reputation, *see* ¶¶ 109-19, *infra.* All of CEO Poleg's behavior was

conducted without consequence from the Company.

## Defendants Defamed Ms. Ressler

109.    One day after blindsiding Ms. Ressler with her abrupt dismissal, on April 24,

2025, Defendants published a press release which was clearly intended to defame, intimidate and

discredit Ms. Ressler, and otherwise unjustifiably brand her as some sort of criminal.

110.    Defendants' press release, ostensibly about Mr. Jani's promotion to CFO,

included wholly unnecessary, defamatory statements about Ms. Ressler, specifically:

> Ms. Ressler's employment with the Company was terminated based on the Company's
> opinion that she engaged in actions that violated Company policies. While the
> Company's review of Ms. Ressler's actions is ongoing, the Company does not believe
> that the actions of the former CFO had any material impact on the Company's previously
> issued financial statements.

111.    Defendants had no obligation, legal, investor-facing, or otherwise, to issue such a

statement.

112.    Defendants could have, but chose not to, issue a press release about Mr. Jani's

promotion to CFO, without any mention of Ms. Ressler. Defendants' decision not to do so and

instead to publish a gratuitous public statement that impugned Ms. Ressler's professional

reputation as a CFO affirmatively suggests that Defendants intended to or endorsed the press

release's defamatory inference that Ms. Ressler was fired for serious financial misconduct,

thereby constituting actionable defamation by inference.

113.    The press release's references to "actions that violated Company policies,"

"ongoing" review, and that Ms. Ressler's conduct did not impact "financial statements," in the

context of a CFO's termination, were designed to (and did) falsely imply that she was fired for

serious financial misconduct and otherwise were intended to cast her in a negative light. Ms.

Ressler did not engage in serious financial misconduct.

114.    The press release contains false statements. First, by Defendants' admission, there was no corporate credit card use policy. While the termination letter referenced violations of Defendants' Code of Conduct (which Ms. Ressler disputes), this is one policy, while the press release mentions her violations of "Company policies" – *i.e.*, more than one. Thus, Defendants' statement about firing her based on actions that violated multiple "policies" was false when it was published.

115.    Defendants' defamatory statements have had their intended effect – numerous individuals orally and in writing have reached out to Ms. Ressler inquiring about what she did to get fired from Defendants and in such an awful manner. As just one example, on April 24, 2025, someone, expressly referring to the press release, commented on Ms. Ressler's personal social media account (emphasis added): "what ***illegal activities*** did you to do to get fired from REAX publicly?? stock dipped."[4]

116.    Titles of articles published by news outlets that covered the press release further demonstrate Defendants' statements' defamatory impact, *e.g.*, "Real Brokerage ***Fires CFO***, names Ravi Jani as successor,"[5] "Real Brokerage ***terminates CFO Michelle Ressler***, Ravi Jani to succeed," etc. (emphasis added).[6]

---

[4] The Company's stock only fell 1.29% following the announcement, a drop that was likely related to seasonal trends and/or market factors, not Ms. Ressler's alleged misconduct which, absent Defendants' gratuitous and defamatory press release, would not have been known to the public. Put simply, Defendants, and not Ms. Ressler, is responsible for any financial impact on the Company or its stock in the aftermath of Ms. Ressler's publicly announced abrupt dismissal for alleged policy violations.

[5] Delozier, Jonathan, *Real Brokerage fires CFO, names Ravi Jani as successor*, HOUSINGWIRE.COM (April 24, 2025 at 5:12pm), https://www.housingwire.com/articles/real-brokerage-new-cfo-ravi-jani-michelle-ressler-fired/

[6] *Real Brokerage terminates CFO Michelle Ressler, Ravi Jani to succeed*, Tipranks.com (April 24, 2025 at 4:43am), https://www.tipranks.com/news/the-fly/real-brokerage-terminates-cfo-michelle-ressler-ravi-jani-to-succeed.

117.    Defendants' wholly unnecessary false public statements about Ms. Ressler's dismissal referencing the Company's "opinion" that she violated unspecified "policies" without any factual recitation regarding the basis of that "opinion" and referencing an "ongoing" review, imply that Defendants' "opinion" is based on facts undisclosed to the reader, thereby constituting actionable defamation based on mixed opinion.

118.    Amplifying the harm, the same day (April 24), President Mr. Srivatsaa published a glowing LinkedIn tribute framing Defendants' new CFO Mr. Jani as the transformative force behind Defendants' success – plainly attempting to erase Ms. Ressler and her indisputable and integral role in all aspects of Defendants' success during her four-plus years as CFO. The President's statements, when viewed in tandem with the defamatory press release, have severely and irreparably harmed Ms. Ressler's reputation and constitute defamation.

119.    Ms. Ressler has felt the impact of Defendants' defamatory (and retaliatory) statements in New York, and in New York City in particular, as this is where she built her reputation and career; where Defendants, a publicly traded company on the Nasdaq (a New York City based stock exchange), do business; where a majority of her professional network that she has spent the last 18 years building lives and works; where she is and will continue applying for new employment; and where she intends to return to work when her daughter is no longer an infant.

## CONCLUSION

120.    As a result of the termination of her employment and the manner in which Defendants handled it, Ms. Ressler has suffered significant economic harm, including, but not limited to, the loss of her employment and millions of dollars in lost wages and benefits, including canceled Restricted Stock Units.

121.     Ms. Ressler has also suffered severe emotional distress, including, but not limited to, significant anxiety, depression, and social isolation. Her professional reputation has been seriously and irreparably harmed as a result of her discriminatory and retaliatory treatment she suffered while still employed and her unlawful dismissal and how Defendants handled it, including, but not limited to, the defamatory press release.

**FIRST CAUSE OF ACTION**
**Interference in Violation of the**
**Family and Medical Leave Act (29 U.S.C. §§ 2611 *et seq.*)**

122.     Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

123.     Ms. Ressler, who had been employed fulltime by Defendants for almost five years, was an employee of Defendants under federal law.

124.     Defendants are "employers" under federal law.

125.     Ms. Ressler was eligible to take leave under the FMLA having worked one thousand two hundred and fifty or more hours within the twelve-month period immediately preceding her request for FMLA leave. Ms. Ressler gave notice to Defendants of her intention to take leave when she announced her pregnancy.

126.     By the acts and practices described, Defendants interfered with, restrained, and/or denied Plaintiff her rights by requiring her to work during her protected leave, in violation of the FMLA, 29 U.S.C. §§ 2612, 2614, and 2615.

127.     Defendants knew that their actions violated the FMLA and/or Defendants' actions were not in good faith.

128.     As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress,

humiliation and other compensable damage unless and until this Court grants relief.

## SECOND CAUSE OF ACTION
### Retaliation in Violation of the
### Family and Medical Leave Act (29 U.S.C. §§ 2611 *et seq.*)

129.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

130.    Ms. Ressler, a qualified "employee," took FMLA leave to give birth to and care for her infant daughter.

131.    Defendants are "employers" under federal law.

132.    By the acts and practices described, Defendants willfully violated the FMLA by retaliating against Ms. Ressler for exercising her rights to FMLA leave by stripping her of her duties, reassigning her duties and business units, and ultimately terminating her employment upon her return from leave.

133.    Defendants knew that their actions violated the FMLA and/or Defendants' actions were not in good faith.

134.    As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

## THIRD CAUSE OF ACTION
### Gender and Pregnancy Discrimination in Violation of the
### New York City Human Rights Law (N.Y.C. Admin. Code §§ 8-101 *et seq.*)

135.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

136.    Ms. Ressler was an "employee" for the purposes of the NYCHRL.

137.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for

33

the purposes of the NYCHRL.

138.    During the majority of her employment with Defendants, including the majority of the relevant time period and the discriminatory conduct at issue, Ms. Ressler resided and worked in New York City. Ms. Ressler also felt the impact of Defendants' gender and pregnancy discrimination in New York City, both personally (resulting in significant mental anguish, anxiety, depression, and social isolation) and professionally (including the substantial diminishment of her role and responsibilities, shifting her role to less qualified employees who were not women, pregnant or new mothers, demeaning her work, and harming her reputation).

139.    Under the NYCHRL, it is unlawful to treat any employee "less well" in the terms and conditions of her employment because of her gender or pregnancy.

140.    Defendants discriminated against Ms. Ressler by *inter alia*, reassigning her duties and business units and reports to men and/or non-pregnant women or women who had not taken a recent maternity leave or who did not have babies; marginalizing and undermining her; excluding her; demeaning her to her team and leadership; during her maternity leave grooming, and later promoting, her less qualified male subordinate into her CFO role; and, following her return from maternity leave, terminating her employment, but not that of her similarly-situated male peers.

141.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

142.    As a result of Defendants' discriminatory treatment and termination of her employment, Ms. Ressler has suffered significant harm, including, but not limited to, millions of dollars in lost past and future compensation and benefits, damages to compensate her for reputational harm and past and future physical and emotional distress, punitive damages, the

reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

## FOURTH CAUSE OF ACTION
### Gender and Pregnancy Discrimination in Violation of the
### New York State Human Rights Law (N.Y. Exec. Law §§ 296 *et seq*.)

143.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

144.    Ms. Ressler was an "employee" for the purposes of the NYSHRL.

145.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for the purposes of the NYSHRL.

146.    During the majority of her employment with Defendants, including the majority of the relevant time period and the discriminatory conduct at issue, Ms. Ressler resided and worked in New York City. Ms. Ressler also felt the impact of Defendants' gender and pregnancy discrimination in New York City, both personally (resulting in significant mental anguish, anxiety, depression, and social isolation) and professionally (including the substantial diminishment of her role and responsibilities, shifting her role to less qualified employees who were not women, pregnant, or new mothers, demeaning her work, and harming her reputation).

147.    Under the NYSHRL, it is unlawful to discriminate against any employee on the basis of their gender and/or pregnancy by subjecting them to inferior terms, conditions, or privileges of employment.

148.    Defendants discriminated against Ms. Ressler by *inter alia*, reassigning her duties and business units and reports to men and/or non-pregnant women or women who had not taken a recent maternity leave or who did not have babies; marginalizing and undermining her; excluding her; demeaning her to her team and leadership; during her maternity leave grooming, and later promoting, her less qualified male subordinate into her CFO role; and, following her

return from maternity leave, terminating her employment, but not that of her similarly-situated male peers.

149.    Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

150.    As a result of Defendants' discriminatory treatment and termination of her employment, Ms. Ressler has suffered significant harm, including, but not limited to, millions of dollars in lost past and future compensation and benefits, damages to compensate her for reputational harm and past and future physical and emotional distress, punitive damages, the reasonable attorneys' fees and the costs of this action, and pre-judgment interest.

### FIFTH CAUSE OF ACTION
**Retaliation in Violation of the
the New York State Paid Family Leave Law (12 NYCRR § 380)**

151.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

152.    Ms. Ressler was an "employee" under New York State law.

153.    The Real Brokerage Inc. and Real Broker LLC were "covered employer(s)" under New York State law.

154.    During the majority of her employment with Defendants, including the majority of the relevant time period and the retaliatory conduct at issue, Ms. Ressler resided and worked in New York City. Ms. Ressler requested and stated her intention to take NYPFL leave when living and working in New York City, and spent just shy of 11 weeks (specifically August 15 through October 25, 2024) of her 12-week NYPFL leave (which expired on November 7, 2024) in New York City. Ms. Ressler also felt the impact of Defendants' NYPFL violations in New York, both personally (resulting in significant mental anguish, anxiety, depression, and social

isolation) and professionally (including the substantial diminishment of her role and responsibilities, shifting her role to less qualified employees who had not stated their intention to or taken NYPFL leave, demeaning her work, and harming her reputation). New York also has a greater interest in protecting Ms. Ressler's right to paid and job protected family leave and to be free from retaliation for exercising that right than any other state or jurisdiction.

155.    Ms. Ressler was eligible for family leave during her employment with Defendants having worked for at least 26 consecutive work weeks preceding the first full day her family leave began.

156.    By the acts and practices described herein, Defendants retaliated against Ms. Ressler for exercising her rights to a parental leave in violation of the NYPFL by substantially dismantling her position, both before and during her maternity leave, not allowing her to return to the same position following her leave, and ultimately terminating her employment.

157.    Defendants knew that their actions violated the NYPFL and/or Defendants' actions were not in good faith.

158.    As a result of Defendants' violations, Plaintiff has suffered, is suffering, and will continue to suffer irreparable injury, monetary damages, mental anguish, emotional distress, humiliation and other compensable damage unless and until this Court grants relief.

<u>SIXTH CAUSE OF ACTION</u>
**Retaliation in Violation of**
**New York Labor Law § 740**

159.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

160.    Ms. Ressler was an "employee" for the purposes of the NYLL.

161.    The Real Brokerage Inc. and Real Broker LLC were Ms. Ressler's "employer" for

the purposes of the NYLL.

162.    During the majority of her employment with Defendants, including the majority of the relevant time period and her protected and Defendants' retaliatory conduct at issue, Ms. Ressler resided and worked in New York City. Ms. Ressler made protected complaints when she lived and worked in New York City and she felt the impact of Defendants' whistleblower retaliation in New York, both personally (resulting in significant mental anguish, anxiety, depression, and social isolation) and professionally (including the substantial diminishment of her role and responsibilities, shifting her role to less qualified employees who had not made protected whistleblower complaints, demeaning her work, and harming her reputation). New York also has a greater interest in protecting Ms. Ressler's right to be free from whistleblower retaliation than any other state or jurisdiction.

163.    Ms. Ressler engaged in protected activities under the NYLL Section 740, *inter alia*, when she raised complaints to Defendants' senior management regarding what she reasonably believed to be violations of laws, rules and/or regulations. Specifically, Ms. Ressler raised complaints regarding the lack of compliance and financial infrastructure for newly launched financial products, premature product launches without accounting, finance, or back-office readiness, and material risk exposures from product initiatives, including risk of duplicate payments, accounting inaccuracies, and tax compliance and regulatory exposure. Further, Ms. Ressler reasonably and in good faith believed if Defendants did not remedy these issues and implement a more accountable leadership structure, it was at risk of additional, imminent violations of law, including securities laws, fiduciary obligations to shareholders, and financial reporting regulations.

164.    Defendants were aware of Plaintiff's protected activities, including, but not

limited to, through the strategic risk memo "Scaling Through Structure" she submitted to Defendants' leadership on April 10, 2025 – 13 days before Defendants terminated her employment.

165.    Defendants violated the NYLL by taking adverse actions against Plaintiff because of her protected activities, including, *inter alia*, silencing, marginalization, grooming a less qualified male subordinate for her role, and ultimately terminating her employment within 13 days of her last protected disclosure on April 10, 2025.

166.    Defendants' actions were willful, malicious or wanton and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

167.    Plaintiff is entitled to damages including, but not limited to, past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## SEVENTH CAUSE OF ACTION
### Retaliation in Violation of
### New York City Human Rights Law (N.Y.C. Admin. Code §§ 8-101 *et seq.*)

168.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

169.    Plaintiff engaged in protected activities under the NYCHRL, including by disclosing her pregnancy and taking maternity leave.

170.    During the majority of her employment with Defendants, including the majority of the relevant time period and the retaliatory conduct at issue, Ms. Ressler resided and worked in New York City. Specifically, Ms. Ressler announced her pregnancy, stated her intention to take maternity leave, took maternity leave and ultimately suffered retaliation as a result while

living and working in New York City. Ms. Ressler also experienced the impact of Defendants'

retaliation both personally (resulting in significant mental anguish, anxiety, depression, and

social isolation) and professionally (including the substantial diminishment of her role and

responsibilities, shifting her role to less qualified employees who were not women, pregnant,

new mothers or who had not stated their intention to or taken maternity leave, demeaning her

work, and harming her reputation) while living and working in New York City.

171.    Defendants were aware of Plaintiff's protected activities.

172.    Defendants violated the NYCHRL by taking adverse actions against Plaintiff

because of her protected activities, including by, *inter alia*, reassigning her duties, business units

and reports, marginalizing and undermining her, excluding her, demeaning her to her team and

leadership, and ultimately terminating her employment following her return from maternity

leave.

173.    Defendants' actions amount to willful or wanton negligence or recklessness

and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

174.    Plaintiff is entitled to damages including, but not limited to past and future lost

wages and benefits, damages to compensate her for past and future physical and emotional

distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment

interest.

## EIGHTH CAUSE OF ACTION
### Retaliation in Violation of
### New York State Human Rights Law (N.Y. Exec. Law §§ 296 *et seq.*)

175.    Ms. Ressler re-alleges and incorporates by reference the allegations contained in

the previous paragraphs of the Complaint as if fully rewritten herein

176.    Plaintiff engaged in protected activities under the NYSHRL, including by

disclosing her pregnancy and taking maternity leave.

177.     During the majority of her employment with Defendants, including the majority of the relevant time period and the retaliatory conduct at issue, Ms. Ressler resided and worked in New York. Specifically, Ms. Ressler announced her pregnancy, stated her intention to take maternity leave, took maternity leave and ultimately suffered retaliation as a result while living and working in New York City. Ms. Ressler also experienced the impact of Defendants' retaliation both personally (resulting in significant mental anguish, anxiety, depression, and social isolation) and professionally (including the substantial diminishment of her role and responsibilities, shifting her role to less qualified employees who were not women, pregnant, new mothers or who had not stated their intention to or taken maternity leave), demeaning her work, and harming her reputation) while living and working in New York City.

178.     Defendants were aware of Plaintiff's protected activities.

179.     Defendants violated the NYSHRL by taking adverse actions against Plaintiff because of her protected activities, including by, *inter alia*, reassigning her duties, business units and reports, marginalizing and undermining her, excluding her, demeaning her to her team and leadership, and ultimately terminating her employment following her return from maternity leave.

180.     Defendants' actions amount to willful or wanton negligence or recklessness and/or evidence a conscious disregard for Plaintiff's statutorily protected rights.

181.     Plaintiff is entitled to damages including, but not limited to past and future lost wages and benefits, damages to compensate her for past and future physical and emotional distress, punitive damages, reasonable attorneys' fees and costs of this action, and pre-judgment interest.

## NINTH CAUSE OF ACTION
### Defamation

182.    Defendants made false statements about Ms. Ressler in a press release published one day after Defendants terminated her employment. Defendants publicly accused Ms. Ressler of actions that violated Company "policies" as the reason they fired her in April 2025 when the termination letter listed just one policy. Additionally, Defendants did not have a corporate credit card use policy.

183.    Defendants' statements impugned Ms. Ressler in her trade, business and/or profession. Indeed, someone she does not know commented on Ms. Ressler's personal social media account, referring to the press release (emphasis added): "what ***illegal activities*** did you to do to get fired from REAX publicly?? . . ."

184.    Thus, Defendants false public statements are actionable *per se.*

185.    Defendants' false public statements about Ms. Ressler's dismissal referencing the Company's "opinion" that she violated its policies without any factual recitation regarding the basis of that "opinion" and reference to an "ongoing" "review," implied that Defendants' "opinion" was based on facts undisclosed to the reader. Thus, the defamatory statements are actionable as mixed opinion.

186.    Defendants' false public statements about Ms. Ressler's dismissal in the press release, viewed as a whole, can reasonably be read to impart a defamatory inference, specifically that Defendants fired Ms. Ressler in April 2025 for serious financial misconduct. Defendants' false public statements about Ms. Ressler's dismissal affirmatively suggest that Defendants intended or endorsed this defamatory inference. Notably, Defendants had no obligation, legal, investor-facing, or otherwise, to issue such a statement. Defendants also had no reason to

mention anything about their purported reasons for firing Ms. Ressler, or mention her at all, in

the Company's press release about Mr. Jani's appointment as CFO.

187.    Thus, the defamatory statements are actionable as defamation by implication.

188.    Ms. Ressler has suffered harm as a result of Defendants' defamatory statements,

including documented damage to her professional reputation.

189.    Ms. Ressler is entitled to compensatory and actual damages for impairment of her

reputation and standing in the business community, in an amount to be determined by the trier of

fact.

190.    Defendants' defamatory statements were made maliciously, and with wanton

and/or reckless, and/or in willful, disregard for Ms. Ressler's rights, and therefore Ms. Ressler is

entitled to punitive damages, in an amount to be determined by the trier of fact.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Ms. Ressler seeks the following relief:

A.  A declaration that the acts, practices, and omissions complained of herein are unlawful and violate the FMLA, the NYCHRL, the NYSHRL, the NYPFL, the NYLL, and state common law;

B.  Back pay and front pay for past and future lost wages and benefits;

C.  Compensatory damages for, among other things, reputational harm, emotional distress, and the loss of employment, compensation, and benefits;

D.  Punitive damages;

E.  Liquidated damages;

F.  Pre-judgment interest (continuing to accrue at a rate of 9% per year);

G.  Post-judgment interest;

H.  The reasonable attorneys' fees and costs of this action; and

I.  Such other and further relief as this Court shall deem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Ms. Ressler demands a trial by jury on all questions of fact raised by the Complaint.

Dated: New York, New York
       July 25, 2025

Respectfully submitted,

**OUTTEN & GOLDEN LLP**
Allison L. Van Kampen
Shira Z. Gelfand
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Email: avankampen@outtengolden.com
Email: sgelfand@outtengolden.com

*Attorneys for Ms. Ressler*